Frederick C. MELTZER,
Plaintiff, Appellee,

v.

COMERICA, INC. and Munder Capital
Management, Defendants,
Appellants.

No. 97–2011.

United States Court of Appeals,
First Circuit.

Heard Feb. 4, 1998.

Decided April 3, 1998.

Gary D. Friedman, New York City, with whom Kenneth M. Bello, Joseph P. Curtin and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, were on brief, for appellants.

Frank J. Teague with whom Edward T. Patten and Mills, Teague & Patten, Boston, MA, were on brief, for appellee.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

Frederick Meltzer brought suit in state court, claiming that he had been discharged without cause and without the compensation specified in his employment contract. The case was removed to federal court based on diversity of citizenship. Following a trial, the jury found in favor of Meltzer and awarded him almost $400,000 in damages. This appeal by the district-court defendants followed.

The main issue on appeal is whether the defendants were entitled to judgment notwithstanding the verdict. In substance, defendants claim the jury was obliged to find that Meltzer had engaged in "an act of serious misconduct" which under his contract would have justified dismissal without further compensation. We set forth the facts in the light most favorable to the verdict. *Transamerica Premier Ins. Co. v. Ober*, 107 F.3d 925, 929 (1st Cir.1997).

In 1993, Comerica, Incorporated, formed a wholly owned subsidiary, World Asset Management. The following year the new subsidiary hired Meltzer as the managing director of its fixed income bond department. To lure him away from his job with an established Boston firm, World Asset Management gave him a three-year contract at a high salary with a guaranteed minimum bonus. The contract provided that if terminated without cause, Meltzer would receive the balance of compensation specified for the entire contract. "Cause" was further defined as including "an act of serious misconduct."

During 1994, World Asset Management had under lease a portable computer terminal from Bloomberg LP, a device known in the trade simply as a "Bloomberg," providing access to real-time stock and bond market quotes and other information. Meltzer's company also leased software, used in risk management for bond portfolios, from Capital Management Sciences, a competitor of Bloomberg LP. World Asset Management secretly lent the Bloomberg computer to Capital Management Sciences in exchange for a discount on the cost of the risk-management software.

The persons primarily responsible for the decision to loan the Bloomberg were Meltzer's superior, Charles Kelso (CEO of World Asset Management) and Meltzer's subordinate, Jonathan Jensen. Meltzer was present at the meeting in which Jensen proposed the loan and Kelso approved it. According to Meltzer, he made no comment on the proposal, nor did he attempt to raise the matter with higher level officials at Comerica. The meeting was in September 1994, and the Bloomberg was actually loaned to Capital Management Sciences in December 1994.

In the meantime, Comerica affiliated itself with another company, Munder Capital Management, and the two companies reorganized World Asset Management as a partnership between them. Kelso was replaced as head of World Asset Management by Stephen Albrecht. Meltzer said at trial that he told Albrecht about the loan of the Bloomberg during December 1994, and Albrecht approved the plan. In any event, Albrecht made further inquiries of Meltzer in February 1995 and ultimately told Meltzer to retrieve the Bloomberg, which Meltzer did.

■ In February 1995, Albrecht discharged Meltzer, purportedly on the ground that his involvement in the loan of the Bloomberg constituted "serious misconduct." Meltzer in turn brought the present action against Comerica and the Munder firm. The defendants accept responsibility for carrying out World Asset Management's employment contract with Meltzer but insist that he was fired for cause. In returning a verdict in Meltzer's favor, the jury found by special verdict that Meltzer had not engaged in "an act of serious misconduct."

The parties agree that Meltzer's employment contract must be construed in accordance with Michigan law. The defendants point us to case law in Michigan holding that an employer can establish its own standards for job performance and can dismiss for cause any employee who fails to adhere to those standards, even if the judge or the jury might think that the standards were unreasonably demanding. *See Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880, 897 (1980). The gist of

defendants' argument on appeal is that the loan of the Bloomberg was manifestly improper and that Meltzer's "participation" or "involvement" necessarily constituted "serious misconduct" providing cause for his termination.

Defendants argue at length that the loan violated the terms of the Bloomberg contract, the general provisions of the Comerica's code of ethics requiring employees to safeguard confidential information, and other civil and criminal restrictions. It is sufficient for us that the extent of Meltzer's involvement or participation in the loan was disputed and that on one reading of the evidence he was no more than minimally connected. The jury was thus free to conclude that even if the loan were serious misconduct, Meltzer's connection to it was not "serious misconduct" on his part.

■ Defendants next assert that they were entitled to an instruction that, although Meltzer asserted that Kelso had approved the loan, "[i]t is not a defense that a supervisor authorized unlawful, unethical or unreasonable acts to be performed." The defendants' proposed instruction contained other language that the district court did adopt, including the tamer statement that "[a]n employer [sic] only has a duty to follow a supervisor's orders if those orders are lawful," and "[a]n employee cannot be discharged for refusing to perform an unlawful act." But obviously the additional language requested by the defendants would have been even more helpful to them.

The difficulty is that the key sentence that the district judge refused to charge seems to us to be misleading in the context of these facts. While there is certainly some behavior that a supervisor cannot "authorize," in the present case Kelso's alleged approval had at least *some* bearing on the question whether Meltzer's failure to report or interfere with the transaction was "serious misconduct." Being unbalanced, the instruction as framed by the defendants did not have to be given. *See Harrington v. United States,* 504 F.2d 1306, 1317 (1st Cir.1974).

■ The defendants further object that Meltzer's post-termination earnings should

been offset against his compensation due under the contract. Well before the scheduled trial, defendants stipulated that if Meltzer was not discharged for serious misconduct, then his damages were the specific amount calculated under his contract for the remainder of the three-year term, specifically, $398,773.97. Ten days prior to trial the defendants moved to set aside that stipulation, and, several days later, they moved to amend their answer to assert an affirmative defense of actual mitigation.

We see no error in the district court's decision that defendants' last-minute attempted change of position should not be allowed because of the extreme delay and the prejudice to Meltzer. *See Grant v. News Group Boston, Inc.*, 55 F.3d 1, 5 (1995) (denial of leave to amend reviewed for abuse of discretion). This makes it unnecessary to consider the district court's alternative ruling that, under the language of the contract, Meltzer was entitled (if discharged for cause) to the balance of the prescribed compensation with no reduction on account of post-termination earnings elsewhere.

Finally, defendants' brief challenges several rulings by the district judge on the admissibility of evidence during trial. We have examined her rulings and concluded that they are either correct or, if not, that they did not constitute prejudicial error. Without going into detail, it is plain that the result of the case would have been no different if each of the three challenged rulings had been resolved by the trial judge in favor of the defendants.

*Affirmed.*