Becky J. LICCIARDI, Plaintiff,
Appellant,

v.

TIG INSURANCE GROUP,
Defendant, Appellee.

No. 97–2008.

United States Court of Appeals,
First Circuit.

Heard Feb. 5, 1998.

Decided April 10, 1998.

---

Leonard Glazer, with whom Frank E. Glazer, Anthony R. Orlando and Law Offices of Leonard Glazer, Boston, MA, were on brief, for appellant.

Carol A. Griffin, Boston, MA, with whom Mark T. Nugent, Providence, RI and Morrison, Mahoney & Miller, Boston, MA, were on brief, for appellee.

Before SELYA, BOUDIN and LYNCH, Circuit Judges.

LYNCH, Circuit Judge.

The malfunction of the Free Fall ride in a Rhode Island amusement park caused it to stop unexpectedly on the upper runoff track. The passengers were jolted. One passenger, Becky Licciardi, then 20 years old, complained that her side and ribs hurt and that she was bruised. She later developed a far more serious condition, fibromyalgia, which she believed was caused by the trauma to her from the accident. She sued the park, which was in bankruptcy, and the park's insurer was substituted as defendant. *See* R.I. Gen. Laws § 27–7–1 (1994).

After an eight day trial, a jury returned a defense verdict. The defense verdict was procured, however, by trial by ambush tactics: the defense Rule 35 medical expert changed course 180 degrees from his report in his testimony on a key topic at the heart of plaintiff's case.[1] Further, he went into a new area of testimony. There was no prior disclosure of the coming volte face; indeed there was a misrepresentation in the supplemental answer to interrogatories filed two days after the jury was impaneled that the expert's testimony would be the same as in his initial report. Plaintiff's counsel protested in vain, objecting to the testimony, and when that failed, moving for a mistrial and then a new trial. Because we believe the district court abused its discretion in admitting the evidence, we vacate the verdict and remand the case.

## I.

On July 10, 1992, Licciardi and her then-fiancé, Torrey LeBlanc, were passengers on the Free Fall ride[2] at Rocky Point Amusement Park, in Warwick, Rhode Island, when the ride malfunctioned. Plaintiff claims that instead of gradually decelerating as it normally did, the ride stopped with "three enormous jerks, thrusting her violently forward and back in her seat before the car came to an abrupt stop on the emergency runoff track." The ride operator had to use a specialized tool to release plaintiff and LeBlanc. Plaintiff and LeBlanc both testified that the car felt as if it was crashing into a barricade when it stopped. As she climbed off the ride, plaintiff told the ride attendant that she was in some pain on the right side of her body, in the area of her ribs. Some 35 to 45 minutes later, plaintiff sought medical attention at the Rocky Point first aid station. The emergency medical technician on duty examined plaintiff, and noted slight bruising and tenderness in the area of plaintiff's right ribs. He recommended that plaintiff go to a hospi-

tal, which plaintiff declined to do. Plaintiff filled out an accident report in which she stated that the "car jerked to a stop [and] I hurt my right side."

The next day Licciardi did go to the emergency room at Tobey Hospital, where she was examined and diagnosed with a contusion to her right lower ribs. The examining physician advised her to avoid lifting activity, to follow up with her regular physician, and to take pain medication as needed. Because her discomfort persisted, plaintiff saw her family physician two weeks later, at which point she was switched to a different medication. Plaintiff returned to college in the fall, but testified that she remained in constant discomfort, particularly experiencing pain in her lower right back, as well as pain radiating down her right leg. Over the next year, plaintiff continued to report to her physicians that she was experiencing persistent back, buttock, and leg pain; that the pain was causing her to lean to the right when she stood; and that her neck, shoulders, and head were constantly aching. Throughout 1993 and 1994 her pain remained essentially unchanged despite physical therapy, and by the end of 1994 she had developed a generalized persistent pain and discomfort termed "fibromyalgia."[3]

Plaintiff filed this lawsuit on December 28, 1994, alleging negligence and breach of warranty. A jury trial began on June 5, 1997, and lasted until June 19, 1997. The jury returned a verdict in favor of the defendant. Plaintiff filed a motion for a new trial, which the district court denied after a hearing. Plaintiff appeals from the judgment and from the denial of the motion for a new trial.

Plaintiff's most meritorious argument on appeal is that the district court committed reversible error when it permitted defendant's medical expert to testify in a manner directly contradictory to and beyond his prior

---

1. Defendant's appellate counsel was not defendant's trial counsel.

2. The Free Fall is a ride in which passenger cars are lifted to the top of a 128–foot tower, and then allowed to "free fall" down to the bottom of the tower and decelerate along a straight-away.

3. Fibromyalgia is a syndrome involving chronic widespread and diffuse pain throughout the entire body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep. *See* Robert M. Bennett, *The Fibromyalgia Syndrome*, in *The Textbook of Rheumatology* 511, 511–514 (William N. Kelley et al. eds., W.B. Saunders Co. 5th ed.1997).

report, where defendant failed to supplement its answers to interrogatories in order to alert plaintiff to this turnaround testimony. We agree.[4]

### II.

As of the start of trial, the plaintiff's theory and the defense theory were straightforward. The plaintiff's theory was that the accident on the Free Fall ride was caused by a failure in the ride's braking systems, which was caused by defendant's negligent maintenance of the ride. This accident, in turn, had caused traumatic injury to Licciardi which eventually led to her more serious fibromyalgia. The defense theory was that the only malfunction in the Free Fall was the failure of a reversing mechanism,[5] that the braking systems functioned properly, and there was no negligence. As for plaintiff's injuries, defendant's theory was that plaintiff had not proven that the fibromyalgia resulted from the trauma plaintiff suffered, and that fibromyalgia results from conditions other than trauma. Importantly, the defense Rule 35 medical expert, Dr. Morgan, in his report, opined that plaintiff had indeed suffered a trauma from the accident, but that this trauma was not the cause of the fibromyalgia. Thus, a major aspect of plaintiff's case was built on the sensible belief that the fact of the trauma was uncontested; the real contest lay elsewhere.

However, at trial, during his direct examination, the Rule 35 expert for the first time offered two new items of testimony. He opined that plaintiff did not suffer the trauma from the accident which she claimed. He also supported that opinion by saying he had been to the park and had inspected the ride. He described the seat and features of the ride, and, although he was a medical expert, concluded that the features of the seat were such that they could not have injured plaintiff as she said. He described the way in which the forces of deceleration would impact a passenger on the Free Fall, and asserted that Licciardi's injuries were not consistent with this type of impact. It is this new testimony which is at issue.

A description of the course of pre-trial discovery and events at trial sets the context. In February of 1995, plaintiff submitted a series of interrogatories to defendant, including expert interrogatories. Defendant answered on May 22, 1995, stating that it "had not yet retained an expert for the trial[, but retained] the right to supplement this answer in accordance with the rules of procedure."

In November of 1995, defendant requested, pursuant to Fed.R.Civ.P. 35(a), a court order compelling plaintiff to submit to a physical examination by Dr. Thomas Morgan, a neurologist. The court granted the motion, and Dr. Morgan performed a medical examination of plaintiff on January 18, 1996.[6] Dr. Morgan took a full medical history from plaintiff, reviewed her medical records, and performed his own neurological examination of plaintiff. After the examination, Dr. Mor-

---

**4.** Plaintiff asserts that the district court committed three additional errors as well. Plaintiff claims that the district court erred in failing to give the jury a supplemental instruction on negligence after receiving a question from the jury regarding the definition of negligence. Plaintiff also claims the court misapprehended its legal authority to poll the jury prior to accepting the verdict, to determine whether the verdict was based on a misunderstanding of negligence. Because of our disposition of the case, we do not reach these two issues.

Finally, plaintiff argues that the district court committed reversible error by ordering the redaction of certain portions of the video-taped testimony of Priscilla Johnson Leavitt, the Free Fall ride attendant. We have reviewed the record and considered the parties' arguments on this issue and find no abuse of discretion in the district court's handling of the matter.

**5.** According to defendant, the reversing mechanism, when functioning properly, is what takes the Free Fall passenger cars down from the upper runoff track, and brings them to their usual stopping point on a platform. Defendant's theory was that the car stopped no more abruptly than usual, but merely failed to back down to the platform, leaving passengers on the upper track until they were safely removed by the ride attendants.

**6.** The court's Rule 35 order allowing defendant's motion authorized only a physical examination and non-invasive diagnostic testing of Licciardi. It made no mention of any other type of analysis or testing—i.e., analysis of the ride itself—to be performed by the Rule 35 expert. This is logical, given that such analysis is not the traditional job of a Rule 35 expert. Defendant's motion gave no hint that its expert would play a broader role.

gan produced a report, which plaintiff received in accordance with Rule 35. The report first detailed plaintiff's medical history since the Free Fall incident, and then stated the following:

After performing this neurological examination and reviewing this patient's medical records, I can say with a reasonable degree of medical certainty that *this patient sustained a bruise and strain to her right lower rib and lumbar paraspinal area as a result of her accident at Rocky Point on 7/10/92.* She was treated for this problem conservatively, and as evidenced by the physical therapy notes, seemed to improve as of September, 1992. Subsequently, the patient went through further evaluations with multiple physicians for lumbar pain and diffuse body pain, with disturbed posture with a tilt to the right; also, complaining of headaches and depression; she was given the diagnosis of fibromyalgia. These complaints and the fibromyalgia syndrome are not causally related to her accident in the amusement park at Rocky Point.

The report further stated that,

[t]he diagnosis, at the time of the injury and within the subsequent six to eight weeks ... was consistent with sprain and strain. The onset was consistent with biologically timed relevant factors. Strains and sprains typically last from a few weeks to a few months consistent with minor soft tissue injury, *and this is related to the amusement park incident.* The patient's subsequent complaints, which ultimately led to fibromyalgia syndrome, are not causally related to the incident.

(Emphasis added). The thrust of Dr. Morgan's report, therefore, was that the accident caused a strain and bruising to plaintiff, but the later, more serious complaints and the diagnosis of fibromyalgia were not related to the accident.

On May 14, 1996, four months after Dr. Morgan examined plaintiff and issued his

report, Dr. Morgan accompanied defendant's lawyers and engineering expert on a visit to Rocky Point. The Free Fall was tested at that time, and Dr. Morgan inspected the ride. Although plaintiff's lawyer was present at Rocky Point on the day of defendant's inspection of the Free Fall, he was not specifically alerted to Dr. Morgan's presence and inspection of the ride. Further, defendant never disclosed until Dr. Morgan was on the witness stand at trial that Dr. Morgan would change his testimony as a result, or that he would testify about his observations of the ride.

On May 7, 1997, nearly one year after Dr. Morgan's inspection of the Free Fall, and two days after the jury in this case was impaneled, defendant gave the following supplemental answer to plaintiff's interrogatory regarding expert testimony: [7]

(a) Thomas F. Morgan, M.D., ... (b) the subject matter upon which Dr. Morgan will testify is *completely set forth in his report, dated January 18, 1996,* a copy of which has already been provided to plaintiff's counsel but which is nonetheless attached hereto; (c) the substance of facts and opinions upon which Dr. Morgan will testify is *completely set forth in his report, dated January 18, 1996* ... (d) the summary of grounds for each opinion is stated in Dr. Morgan's report.

(Emphasis added).

The plaintiff's case took six days to put in. Dr. Morgan testified near the end of trial, starting on day seven of trial. At trial, Dr. Morgan was permitted to testify, over plaintiff's persistent objections, that he examined the Free Fall and its seats when he visited Rocky Point, and that nothing in the car could have caused a localized bruise to plaintiff's kidney and ribs. Dr. Morgan's testimony included the following:

Q: Now, Doctor, what is the mechanism of a bruise, a localized bruise occurring?

---

**7.** Fed.R.Civ.P. 26(e) requires a party "seasonably to amend a prior response to an interrogatory ... if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writ-

ing." The Rule also provides that this duty to supplement extends to information contained in an expert witness' report, and that "any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) [requiring pre-trial disclosure of witnesses and trial exhibits] are due."

A: The mechanism to get a bruise means that you have to have sustained a load or a punch or a pressure to the bruised area or that area has to push into something, like a compression.

Q: And Doctor, based upon your examination of this gondola, examination of the seat—you're actually sitting in it—based upon where Miss Licciardi explained to you where the bruise was, based upon the location as described in the Tobey Hospital record and based upon her description of it as being a kidney-like punch, do you have an opinion to a reasonable degree of medical certainty as to whether or not there is a structure inside the ride on the seat which could produce that mechanism of injury?

. . .

A: Yes, I do have an opinion.

Q: And what is your opinion, please?

A. There is no structure in that seat that would give you a localized kidney punch with a bruise.[8]

In addition to testifying that he believed the Free Fall car could not have caused Licciardi's injury as she described, Dr. Morgan discussed the engineering and physics of the ride. He testified that he was familiar with the forces of deceleration, and that based upon his understanding of those forces and his understanding of the ride, it was his opinion that on the ride the maximum deceleration force would impact a passenger's body "in the buttock region."[9] Further, he testified, Licciardi never complained of nor described any type of injury to her buttocks following the ride.[10] None of this testimony was alluded to in Dr. Morgan's report.

## III.

◼ We will disturb a decision to admit or exclude expert testimony only if there was an

---

**8.** Doctor Morgan's testimony as to how he came to inspect the ride, and what his inspection entailed included the following:

> Q: And how did you gain your familiarity with that ride?
> A: . . . I was out at the ride to get a familiarity with what was described in this particular ride to get an understanding of how the ride worked and how such a ride could give an injury mechanism [sic] as to how injuries happen.
> . . .
> Q: Doctor, when you were at the ride, can you tell us what you looked at?
> . . .
> A: Yes. I walked up the stairs and noticed this cabin or gondola appearance with these four seats. . . .
> Q: Doctor, would you describe for us what the seat back is like.
> . . .
> A: Yes. I actually sat in the seat also. And it's a very rigid structure. The back and the restraints come over your shoulders and lock you in very tightly and you're sitting on that bottom pad.
> . . .
> Q: Now, Doctor, the back of the ride, could you describe the back of the ride where it would match up with Miss Licciardi's back, based upon the description in the Tobey Hospital report, as to the location of the bruise?
> . . .
> A: Yes. [A passenger's] back sits flush against this rigid structure. It's a very smooth surface. And that's where the back would be—where the back would be against.

**9.** Dr. Morgan's testimony on this point included the following:

> Q: Now, Doctor, with respect to your observation of the ride, did you come to an understanding as to when the rider is on their back, what forces are applied to the ride?
> . . .
> A: Yes, I do [sic].
> . . .
> Q: And Doctor, you are familiar from your experience in treating people that deceleration is a force?
> A: Yes, it is.
> . . .
> Q: Now, Doctor, with respect to the location of the body where the force is being applied to during this procedure, based upon your observation of the ride and your understanding of how the forces come into play, do you have an opinion to a reasonable degree of medical certainty as to where the forces of deceleration impact the person's body?
> A: Yes. You would expect the maximum force to be in the buttock region from the braking system.

**10.** Dr. Morgan stated that "[t]here's no injury to the buttocks at the Tobey Hospital. It's contusion of the right lower ribs." And, in response to counsel's question whether Licciardi described to Dr. Morgan "feeling any discomfort, pain or experience any injury whatever in her buttocks as a result of this ride," Dr. Morgan responded that "she did not."

abuse of discretion which resulted in prejudice to the complaining party. *See Poulin v. Greer*, 18 F.3d 979, 984 (1st Cir.1994); *cf. General Elec. v. Joiner*, —— U.S. ——, ——, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997) (holding that appeals courts review trial court decisions to admit or exclude expert testimony under *Daubert* on an abuse of discretion standard).

"Recognizing the importance of expert testimony in modern trial practice, the Civil Rules provide for extensive pretrial disclosure of expert testimony." *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992). Rule 26(e) of the Civil Rules requires a party to supplement its answers to interrogatories "if the party learns that the response is in some material respect incomplete or incorrect" and the other party is unaware of the new or corrective information. *See* Fed.R.Civ.P. 26(e)(2). That rule also requires a party to inform another party of a material change in or addition to information contained in an expert's pre-trial report. *See* Fed.R.Civ.P. 26(e)(1). This supplementation requirement increases the quality and fairness of the trial by "narrowing [the] issues and eliminat[ing] surprise." *Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 7 (1st Cir.1985) (internal quotation marks omitted); *see Thibeault*, 960 F.2d at 244.

■ In order to "ensure that the spirit of open discovery embodied in Rule 26 is not undermined either by evasion or by dilatory tactics," *Thibeault*, 960 F.2d at 244, this court has looked to a variety of factors in assessing a claim of error under Rule 26. Among the factors to consider are "the conduct of the trial, the importance of the evidence to its proponent, and the ability of the [opposing party] to formulate a response." *Johnson*, 775 F.2d at 8; *see also Thibeault*, 960 F.2d at 246 ("[T]he focus of a preclusion [of testimony not previously disclosed to the opposing party] inquiry is mainly upon surprise and prejudice, including the opponent's

ability to palliate the ill effects stemming from the late disclosure."). In *Johnson*, this court also noted that part of the purpose of the disclosure and supplementation requirements in Rule 26 was to alleviate "the heavy burden placed on a cross-examiner confronted by an opponent's expert whose testimony had just been revealed for the first time in open court." 775 F.2d at 7. *See also* 8 Charles A. Wright & Richard L. Marcus, *Federal Practice and Procedure* § 2049.1 (2d ed. 1994) ("[Rule 26] makes a special point of the importance of full disclosure and supplementation with regard to expert testimony, a traditionally troublesome area concerning last-minute changes."). To increase the effectiveness of this rule, the Advisory Committee Note suggests that the court may impose sanctions on one who defies the rule, including exclusion of evidence, granting a continuance, or other appropriate action. *See Johnson*, 775 F.2d at 7.

■ Dr. Morgan's changed testimony on two points was highly prejudicial to plaintiff's case. Counsel prepared plaintiff's case on the assumption that the question of causation regarding the original localized bruising and trauma was not in dispute, for defendant's own expert had conceded there was such causation. Plaintiff's medical case therefore focused on proving the connection between the original bruising and the later, more serious, fibromyalgia. On the issue of causation of the fibromyalgia, the parties had battling experts. Fibromyalgia is a syndrome of ambiguous origin, as defendant's expert emphasized. Both plaintiff's treating physician and her expert testified that plaintiff's fibromyalgia was caused by the trauma and injuries she suffered from the accident.

Scant attention was paid to establishing that the accident did cause trauma, because it had been conceded by the defense medical expert. The record lacks the sort of testimony which plaintiff would have put in had plaintiff known this to be at issue.[11] Thus,

---

11. Indeed, counsel for defendant seized on plaintiff's failure to put in such evidence in his closing arguments. Counsel emphasized Dr. Morgan's diligence in visiting the park to inspect the ride, and plaintiff's expert's lack of diligence in failing to do the same. The following excerpt from

defendant's closing arguments illustrates how defendant took advantage of plaintiff's surprise:

> Why would Miss Licciardi remember so much about the ride, but absolutely nothing about the ... restraint system? ... The restraint system is smooth. The restraint system does

plaintiff was prejudiced by presenting a case addressed to one key issue, only to have defendant put on a case addressed to a different predicate key issue.[12] *See Fortino v. Quasar Co.*, 950 F.2d 389, 396–97 (7th Cir. 1991) (finding trial court's admission of testimony erroneous and prejudicial where plaintiff violated Rule 26 by failing to supplement answers to interrogatories with the new testimony, where that testimony was "critical" to the case and completely unexpected from defendant's point of view); *cf. Voegeli v. Lewis*, 568 F.2d 89, 96–97 (8th Cir.1977) (finding trial court's admission of expert testimony erroneous and prejudicial where expert had changed opinion since deposition and defendant did not alert plaintiff to this change).

Moreover, the engineering testimony presented by plaintiff was addressed to the issue of whether the malfunction in the Free Fall that caused it to stop abruptly on the upper runoff was attributed to negligence. It was not addressed to whether the plaintiff could have been injured by the seat at the ride as she claimed. The only "expert" testimony on this point came from Dr. Morgan, a Rule 35 medical expert, who went beyond the scope of an ordinary Rule 35 examination, and far beyond the scope of his report, in his testimony about the ride itself. On both of these points, plaintiff had no opportunity to prepare her own case or conduct a meaningful cross examination. *See Freund v. Fleetwood Enters., Inc.*, 956 F.2d 354, 358 (1st Cir.1992) (holding that trial court properly excluded plaintiff's expert testimony where substance of that testimony was not made known to defendants until the middle of trial, and noting that "had [defendants] known about the [expert] testimony sooner, they might well have decided to counter it, through cross-examination or other expert testimony"); *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 764 (5th Cir.1989) (trial court properly excluded expert testimony where defendant first learned about additional tests conducted by plaintiffs' expert when the expert testified at trial, depriving defendant of the opportunity to engage its own expert to analyze and testify about the tests); *Labadie Coal Co. v. Black*, 672 F.2d 92, 94–95 (D.C.Cir.1982) (finding erroneous and prejudicial district court's admission of documents where plaintiff was alerted to the documents for the first time after it had rested its case and on the last day of trial, and noting that "when the documents were finally produced, [plaintiff] had little, if any, time effectively to ... cross examine [defendant] as to their contents"); *cf. Meltzer v. Comerica*, 140 F.3d 321 (1st Cir.1998) (trial court properly prohibited defendants from changing their position on a pre-trial stipulation at the last minute, where such change would have prejudiced plaintiff).

---

not have any bumps on it in the location of your kidney.... So how does this blow occur that's complained of? You might expect that if there was something unusual about how this could happen, we would have heard some evidence from the plaintiff to explain this. Common sense. You don't need a lot of in-depth looking at this problem to say, "Well, it's smooth back. You're on your back.... How do you get this blow to your ribs in the back, the most protected area of the ride?"

...

Well, did Dr. Himmel [plaintiff's medical expert] have any idea how this ride works? No. Has Dr. Himmel seen it? No. Does he understand the forces generated during its deceleration? No.

...

Dr. Morgan, on the other hand, in performing the independent analysis said, "I want to see the ride." ... So he goes to see it. And what does he come up with? This is how the forces operate. "There's no explanation for how she gets a black and blue on her kidney on this ride, assuming everything she says is true ... I

would expect her to have a bruise on her body, not in her kidney."

...

So why does the former employee of a small amusement park and her boyfriend ... able [sic] to tell you that she got this bruise on the ride, but offer absolutely no indication of how that came to be?

Of course, there is a logical explanation for why plaintiff offered no such evidence: she was unaware that there was any need for such evidence until defendant offered Dr. Morgan's surprise testimony on the second-to-last day of trial.

12. Counsel for defense, in defending the surprise testimony, said, "the basic premise what [sic] we're looking for in this case is whether or not there was something on the ride that hurt her back as she described." But that was not the premise on which the case was tried, given Dr. Morgan's report, and plaintiff was unaware until Dr. Morgan's surprise testimony that it was even an issue at all. Counsel's comment reinforces our sense that this was an ambush situation.

..

There was another aspect of prejudice as well. Unbeknownst to plaintiff before trial, her very credibility as to whether she had suffered the trauma she described from the accident was challenged. And that challenge came from defendant's Rule 35 medical expert. From Dr. Morgan's report, plaintiff had no reason to believe Dr. Morgan would challenge her credibility on this (or indeed any) point. There was no suggestion in that report that plaintiff was not credible in reporting any of her symptoms, whether of the trauma or of the fibromyalgia.

■ Defendant makes four arguments as to why any error in admitting Dr. Morgan's turnaround testimony is not reversible.[13] First, defendant claims that Dr. Morgan's new testimony was not expert opinion testimony at all, but was based purely on his "first hand observations of the interior" of the Free Fall ride. No such distinction was made to the jury nor did defendant offer Dr. Morgan as a lay witness. Dr. Morgan was testifying as a medical expert, offering opinions based on "reasonable medical certainty," and the jury undoubtedly took all of his testimony to be based on his expert knowledge.

■ Defendant's second argument is equally meritless. Defendant claims that Dr. Morgan's trial testimony should not have come as a surprise to plaintiff because plaintiff's counsel was at Rocky Point on the day of the Free Fall demonstration and inspection, and he had some information that a Dr. Morgan was there.[14] Plaintiff's counsel states that he was not aware that Dr. Morgan was inspecting the ride,[15] and that even

if he was aware of this, it would be irrelevant because he had no reason to believe that Dr. Morgan's testimony had changed as a result of the inspection. We agree.

Defendant suggests that because plaintiff was aware of the presence of a Dr. Morgan at the Free Fall demonstration, plaintiff should have compelled supplementation of Dr. Morgan's report or the answers to interrogatories. But plaintiff was entitled to assume that defendant would abide by the rules and inform plaintiff of a material change in Dr. Morgan's opinion. Indeed, when plaintiff received defendant's "supplemental answers" two days after jury impanelment and one year after the Free Fall inspection, any thoughts that Dr. Morgan's opinion may have changed since his initial report were dispelled by defendant's statement that Dr. Morgan's testimony was "completely set forth" in his initial report.

■ Defendant's third argument is that even if Dr. Morgan's surprise testimony did constitute unfair surprise, any error in its admission was harmless because it was "cumulative" of other testimony. This is so, according to defendant, because Torrey LeBlanc, plaintiff's former fiancé who was on the ride with plaintiff on the day the ride malfunctioned, testified that he did not recall seeing any protrusions in the car. But, as plaintiff aptly notes, LeBlanc did not testify as an expert giving an opinion as to causation.[16] Dr. Morgan's testimony was prejudicial to plaintiff's case because plaintiff did not herself put in expert testimony to substantiate the causal connection between the Free

---

**13.** These are the only arguments defendant makes on appeal regarding the propriety of the admission of Dr. Morgan's new testimony. All other arguments are waived. *See King v. Town of Hanover,* 116 F.3d 965, 970 (1st Cir.1997) (claims not argued on appeal are deemed waived).

**14.** The trial judge apparently found this argument convincing and overruled plaintiff's objection to the admission of Dr. Morgan's new testimony on this ground alone.

**15.** Indeed, plaintiff's counsel had no reason to believe that the Dr. Morgan who was the medical expert would be at Rocky Point. It is not the job of a Rule 35 expert to examine the scene of an accident, nor to reconstruct that accident. It

was his job to perform a medical examination of plaintiff, which he did, and as far as plaintiff was concerned Dr. Morgan would have no further involvement in the case other than perhaps to testify to his examination of plaintiff.

**16.** LeBlanc's testimony on this subject, which defendant asserts renders Dr. Morgan's testimony merely cumulative, consisted, in its entirety, of the following dialogue on cross-examination by defendant's counsel:

Q: And as I understand it, the inside of the car doesn't have anything protruding; any arm rests or anything like that, does it?
A: I don't recall any, no.

Fall incident and the initial bruising; plaintiff understood that to be a given.

 Finally, defendant argues that the proper remedy for a Rule 26 violation is not exclusion of the testimony, but a request for a continuance. *See Newell Puerto Rico v. Rubbermaid, Inc.*, 20 F.3d 15, 22 (1st Cir. 1994) (affirming trial court's decision not to exclude testimony despite proponent's failure to supplement answers to interrogatories under Rule 26, and noting that "[i]f counsel felt ill-prepared to cross-examine Mr. Villamil when faced with his testimony at trial, counsel's solution was to request a continuance"). It is true that, where effective to counteract the surprise to one party wrought by the other party's failure to abide by Rule 26, a continuance or the calling of a rebuttal witness is preferable to terminating the trial and beginning anew. However, a continuance is not effective in every circumstance to counteract the unfair surprise. *See Thibeault*, 960 F.2d at 246 ("[A] continuance is often ineffectual as a sanction and unfair to both the court and the opposing party.").

This is a legitimate question of whether a lesser remedy—a continuance—would have sufficed. There are several reasons why a recess and a continuance of a trial would not have been an adequate remedy. First, several of our cases preferring a continuance arise in the context of claimed surprise after there has been some belated, subtle notice, of a change in an expert's testimony. *See, e.g., Newell*, 20 F.3d at 21–22; *cf. Stevens v. Bangor and Aroostook R.R. Co.*, 97 F.3d 594, 598–600 (1st Cir.1996) (in Federal Employers' Liability Act action against railroad, trial court properly excluded defendant's proffered evidence of myocardial infarction plaintiff suffered two weeks prior to trial, where defendant failed to produce expert testimony explaining relationship between infarction and plaintiff's work and life expectancy; defendant had notice prior to trial and two weeks was enough time to engage expert). Here, there was no subtle notice of change in testimony; until Dr. Morgan testified, plaintiff did not know of his changed position. Second, even in cases where the surprise comes at trial, we have considered whether the new testimony is a departure from the general scheme of the expert's report. *See Johnson*, 775 F.2d at 8. In *Johnson*, it was not. Here, most assuredly, Dr. Morgan's testimony departed from the general scheme of the report. Indeed, it both directly contradicted a portion of his report and went into an entirely new area.

Third, the surprise testimony was not on an arguably peripheral matter. It went to the heart of the plaintiff's case, for reasons we have explained. The surprise was not only about whether plaintiff did suffer trauma but that a Rule 35 medical expert was now testifying as to his observations of the accident scene and whether plaintiff could have been so injured. "We think it is beyond dispute that an eleventh-hour change in a party's theory of the case can be [as harmful as the introduction of new expert testimony on the eve of trial], perhaps more harmful, from the standpoint of his adversary." *Thibeault*, 960 F.2d at 247 (citations omitted). Defendant violated both of Rule 26's dual purposes—"narrowing of issues and elimination of surprise." *See Johnson*, 775 F.2d at 7.

Fourth, in considering what plaintiff would have had to do, even with a recess and continuance, to meet the surprise testimony, we see no practical outcomes except outcomes which would have been prejudicial to plaintiff before the jury. It is likely that plaintiff would have, after her case had closed, had to recall almost all of her witnesses, both experts and not, on the point that the accident at the ride could have and did cause the trauma she claimed. *Cf. Freund*, 956 F.2d at 358 ("[A] continuance midway through the trial could have meant losing the benefits of previously cross-examined witnesses...."). Most likely, a recess would have been required as plaintiff scrambled to get new evidence, perhaps engaging a new expert. This recess and continuance situation would give defendant, who did not bear the burden of proof, a decided advantage and unfairly tipped the playing field.

Fifth, we consider important a factor identified by *Thibeault*: the incentive system created for counsel to engage in violations of their Rule 26(e). "If continuances were granted as a matter of course for violations

of Rule 26(e), the rule could always be disregarded with impunity." *Thibeault,* 960 F.2d at 246. Here, affirming the verdict would put defendant in an almost no-lose situation: if the change in testimony were admitted, it would severely prejudice plaintiff, and if a recess and continuance were granted, defendant would still gain an advantage. On this record there is little reason to think the actions of defense counsel were not deliberate. *See Johnson,* 775 F.2d at 8 (testimony properly excluded "where courts have found some evasion or concealment, intentional or not, on the part of the litigant offering the evidence"). Such conduct should not be rewarded.

In concluding, we stress that the solution of a continuance, where the continuance would be effective, is generally to be commended. Evidence and theories evolve in the last minute preparation for trial and trial itself, when counsel's focus is most intense. It is common for there to be some deviation between what was said in discovery and what comes out at trial, and a continuance may well be adequate to handle a material deviation. But this is an extreme case, both in the prejudice wrought and the apparent deliberateness of the behavior—and we have no hesitation, despite our respect for the trial judge and the general latitude allowed in such matters, in concluding that in this case a new trial is necessary.

*Vacated and remanded.*