USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1976

 RICHARD F. KLONOSKI, M.D., ET AL.,

 Plaintiffs, Appellants,

 v.

 BENJAMIN MAHLAB, M.D., ET AL.,

 Defendants, Appellees.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF NEW HAMPSHIRE

 [Hon. Steven J. McAuliffe, U.S. District Judge]

 Before

 Torruella, Chief Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Stahl, Circuit Judge.
 
 

 Joan A. Lukey, with whom Hale and Dorr LLP, Michael G.
Bongiorno, and John T. Gutkoski were on brief for appellants.
 Ronald L. Snow, with whom Orr & Reno, P.A., James P. Bassett,
and Cordell A. Johnston were on brief for appellees.

September 23, 1998

 
 BOWNES, Senior Circuit Judge. This is an appeal from a
jury verdict of no liability in a medical malpractice case. 
Plaintiff-appellant is Richard K. Klonoski, M.D., who brought suit
on his own behalf for loss of consortium, as administrator of the
estate of his wife Jolanta, and on behalf of their three children. 
Defendants-appellees are Benjamin Mahlab, M.D., Mary Hitchcock
Memorial Hospital, Inc., and Hitchcock Clinic, Inc.
 We address only one of the three issues raised by
appellant because it is dispositive. On the thirteenth day of
trial during cross-examination of Dr. Klonoski, the last witness in
plaintiff's case, defendants disclosed for the first time and used
letters written by Mrs. Klonoski to her sister in Poland. Excerpts
from the letters were allowed in evidence. Neither Dr. Klonoski
nor his attorneys knew of the existence of the letters prior to
this time, despite a court order requiring disclosure of such
information prior to trial. We find that this constituted trial by
ambush. We vacate the judgment below and remand for a new trial.
 I.
 BACKGROUND

 Jolanta Klonoski and her husband, Dr. Klonoski, were the
parents of two children: Brian, born in Poland, and Karina, born
in the United States. Dr. Klonoski was born and raised in
Connecticut. He received his medical training in Poland where he
met and married his wife. After he finished his medical training,
he, his wife, and their son, Brian, moved to the United States. 
Mrs. Klonoski became pregnant with their third child in September
or October of 1992. At that time Dr. Klonoski was employed by Mary 
Hitchcock Memorial Hospital as a cardiologist. On Saturday, May 8,
1993, at approximately 11:15 a.m., Mrs. Klonoski went to the
Birthing Pavilion of the Dartmouth-Hitchcock Medical Center because
of vaginal spotting. She was sent home in the afternoon. Mrs.
Klonoski returned to the Birthing Pavilion that night about 9:00
p.m. complaining of severe epigastric pain. She remained in the
hospital until her death on Monday, May 10, of a massive cerebral
hemorrhage. Prior to Mrs. Klonoski's death she was delivered of a
healthy baby girl, subsequently named Caroline. 
 Dr. Klonoski was in San Diego at a medical meeting of
cardiologists on Saturday, May 8. He was notified late Saturday of
his wife's admission to the hospital. He flew home on Sunday,
arriving at the hospital late in the day. His wife was comatose
and did not recognize him. After conducting his own investigation
into the cause of his wife's death, Dr. Klonoski consulted with an
obstetrician in Connecticut and then brought suit.
 PRETRIAL DISCOVERY
 As is usual in a well prepared medical malpractice case,
both sides engaged in extensive pretrial discovery and, as is also
usual, the parties squabbled about what information should or
should not be disclosed. Over a year prior to trial, plaintiff
disclosed, as part of the discovery process, the address in Poland
where Mrs. Klonoski's father and sister lived, the address to which
her letters (the evidence in dispute) were sent.
 The district court issued a nineteen-page discovery order
on July 19, 1996, covering disputes between the parties. In part
of its order, the court stated: 
 defendants shall produce a list of all persons
 known by them to possess discoverable
 information related to: (1) marital discord
 between Dr. and Mrs. Klonoski; and (2) the
 paternity of Dr. Klonoski's youngest daughter. 
 To the extent defendants can more persuasively
 support their assertion that such a list (or
 the names of particular people which would
 otherwise appear on such a list) is protected
 by the work product doctrine (i.e., with
 references to precedent and/or scholarly
 writings on the subject), they shall provide
 plaintiffs with a privilege log as
 contemplated by Fed. R. Civ. P. 26(b)(5) and a
 list of cases and/or scholarly writings which
 specifically support their claim of privilege. 
 Plaintiffs will, of course, then be free to
 file an appropriate motion to compel. 

In its conclusion the court ordered:
 Defendants shall produce a list of the names
 of individuals having knowledge of
 discoverable information relating to the
 issues of marital discord and paternity and a
 general description of the nature of that
 information on or before August 14, 1996. To
 the extent that defendants are able, in good
 faith, to legally support an assertion of
 privilege with regard to some or all of those
 names, they shall produce a privilege log as
 described above.

 A final pretrial order was issued on December 19, 1996. 
It provided that a jury would be drawn on January 7, 1997, and the
presentation of evidence would commence on January 13. The order
noted that both parties had submitted requests for jury
instructions. After noting that some motions in limine had been
filed, the court gave the parties until December 31, 1996 to file
additional motions in limine, with objections to be filed not later
than January 10, 1997. Exhibits were to be premarked and
submitted, along with any objections, not later than January 7,
1997. Defendants were ordered to "disclose all documents ordered
disclosed after close of business on December 27, 1996, forthwith
[sic]." 
 The penultimate paragraph stated in pertinent part: 
 All counsel and the court anticipate
 conducting a brief Daubert hearing prior to
 the testimony of plaintiffs' psychological
 expert, who is expected to testify as to the
 loss of enjoyment of life, or hedonic damage,
 aspect of the estate's wrongful death claim. 
 The court expects that that hearing will be
 held at some point during the first week of
 trial as is convenient to counsel, and the
 parties agree that one hour should be
 sufficient.

The order also required a "final will-call witness list." The
final paragraph exhorted the parties to try to settle the case. It
would appear from the order that all discovery had been completed
and the case was ready for trial.
 DIRECT EXAMINATION OF DR. KLONOSKI
 We next set forth the pertinent parts of Dr. Klonoski's
testimony.
 After moving from Poland to the United States, Mrs.
Klonoski wrote frequently to her family in Poland and sent packages
to them. Her father visited her and Dr. Klonoski, and stayed for
six months. She was quite happy when he was there, but felt lonely
when he went back to Poland. Dr. Klonoski was working long hours
at the hospital in Connecticut where he was training. 
Consequently, he was not spending much time at home with his
family. His wife complained about the long hours he had to spend
at the hospital. Mrs. Klonoski was thirty-five years of age. She
did not have a driver's license and was "house-bound" with their
two small children. 
 In early 1990 there was a period of stress in the
marriage. Dr. and Mrs. Klonoski "had some strong discussions." 
"[T]here was a lot of stress between us." The problem was that
Mrs. Klonoski wanted her husband to spend more time at home with
the family. He could not accommodate her because he was in the
residency program at the hospital which required that he spend a
great deal of time there.
 Dr. Klonoski became angry at his wife and filed for
divorce. The divorce proceedings remained pending for four or five
weeks. The couple did not stop living together during this period. 
There was more stress in the house, "but everything typically went
on." At the end of the five-week period Dr. Klonoski and his wife
talked things out and decided that they did not want a divorce, so
the divorce proceeding was dropped. In May of every year, Dr.
Klonoski gave his wife one rose for each year that had passed since
their first meeting in Poland. In May of 1990 the doctor followed
this ritual.
 Things eventually changed "tremendously" for the better. 
Dr. Klonoski completed his residency program in June of 1990 and he
went on to a sub-specialty program. This enabled him to spend more
time with his family. Mrs. Klonoski became pregnant in June of
1990.
 Dr. Klonoski had been accepted into the cardiology
program at the Mary Hitchcock Memorial Hospital and the Hitchcock
Clinic in 1989. The family moved to Lebanon, New Hampshire, in
June of 1990. Mrs. Klonoski was excited about the move. It was "a
new stage in [their] lives." When the Klonoskis relocated to
Lebanon, Mrs. Klonoski was pregnant, their oldest child, Brian, was
six, and their daughter Karina was three. A short time later, in
July 1990, Mrs. Klonoski had a miscarriage. She was treated by
doctors at the Dartmouth-Hitchcock Clinic.
 Mrs. Klonoski could not reconcile herself to the fact
that her husband had to work harder than Polish doctors. She did
not like his going to medical conferences because he was away from
the family too much. Outside of this, things were "going great"
between Dr. Klonoski and his wife. She "blossomed" and became very
self-confident and self-reliant. She obtained a driver's license
just before she left Connecticut for New Hampshire. This helped a
lot because she could go places with the children and do things.
 In October of 1990 she obtained a job as a bank teller. 
She also attended Lebanon College. After she had been there a
time, she was offered a position teaching Polish but refused
because she did not want to take too much time away from the
family. She was devoted to the children.
 Mrs. Klonoski became pregnant again in the fall of 1991. 
She suffered another miscarriage. Both spouses were devastated. 
Routine testing was advised and Dr. Klonoski encouraged his wife to
take the tests. She did not, however, take all of the tests.
Generally speaking, Mrs. Klonoski was healthy. She exercised by
doing calisthenics and running.
 Mrs. Klonoski made a lot of friends in Lebanon. She was
ebullient, very outgoing, very effervescent. Dr. and Mrs. Klonoski
socialized occasionally, but were not party people. They preferred
to spend their leisure time together as a family.
 Mrs. Klonoski became pregnant again in September or
October of 1992. Both spouses were worried because of the prior
miscarriages. This was the pregnancy that ended in the birth of a
daughter, Caroline, and Mrs. Klonoski's death.
 There was considerable testimony about Mrs. Klonoski's 
physical condition during the pregnancy. She did not complain to
her husband excessively. In early spring, 1993, Dr. Klonoski
accepted a fellowship at Massachusetts General Hospital in Boston. 
His wife was concerned about moving to Boston. 
 The family attended Dr. Klonoski's brother's wedding on
April 24, 1993. He was an usher and his son, Brian, was the ring
bearer. A videotape taken at the wedding showing his wife and
daughter was presented to the jury. This was a good period during
their marriage marred only by the worries both had about the
pregnancy and the move to Boston.
 Dr. Klonoski was away at a medical conference in San
Diego the week his wife was admitted to the hospital. The
conference was important to his career because of the knowledge he
would get in his specialty and as a job forum. He had skipped two
prior conferences, once because his wife had asked him not to go
and another time because she had recently had a miscarriage. Mrs.
Klonoski was "not thrilled" about his going to the conference, but
she did not ask him not to go. Other doctors and some nurses from
the Hitchcock Hospital-Clinic establishment also attended the
conference in San Diego. Dr. Klonoski left for the conference on
May 5; his return was scheduled for May 9. His wife's due date was
May 28. Before he left he bought her a bouquet of her favorite
flowers for Mother's Day on May 9. At the time Dr. Klonoski left,
Mrs. Klonoski had not exhibited any signs of serious problems. He
was not even aware that his wife was ill when he left.
 Dr. Klonoski called home on Friday evening. His wife
told him that everything went fine at her prenatal visit, but that
she did not feel well and if she continued to feel badly, she would
go to the doctor the next day. She called the next day and told
him that she continued to feel poorly and was going to the
hospital. She did not mention vaginal bleeding. We have already
related the essentials of what happened at the hospital when Dr.
Klonoski visited his wife. She was comatose by the time he arrived
at the hospital and did not recognize him. He was informed by a
neurosurgeon that his wife was brain-dead due to a massive
hemorrhage of her brain. He was with her when the life supports
were disconnected and she died. 
 Direct examination of Dr. Klonoski drew to a close with
his statement, "I loved my wife without reservation, and I still
love her."
 CROSS-EXAMINATION OF DR. KLONOSKI
 On cross-examination, it was established that Dr.
Klonoski was suing, inter alia, as administrator of his wife's
estate. He acknowledged that his wife did not have a will and he
knew he would receive the first $100,000 of his wife's estate.
 It was brought out that initially after their marriage
his wife stayed in Poland for a time while he was in the United
States working as a medical clerk. During this time he and his
wife corresponded regularly. All of his wife's letters to him were
written in Polish. In response to questions he stated that his
wife had an older sister, named Marta. 
 Dr. Klonoski testified, as he had on direct examination,
that his wife's father had visited in the fall and winter of 1989-
90. Other than Christmas cards, he had not stayed in touch with
his wife's family and had not sent them photographs of the children
subsequent to his wife's death.
 There was a series of questions about his wife's plans
for the future. He testified that he had no specific information
about his wife's future plans. He did not know any of his wife's
friends who worked at the same bank as she did. He had never met
any of his wife's work-colleagues. 
 Dr. Klonoski testified that he and his wife planned the
pregnancy that resulted in her death and the birth of their third
child, Caroline. He testified that everybody in the cardiology
department was very helpful and supportive after his wife's death. 
Money was collected for his family and food was prepared for the
children and himself. All of this was very helpful and he
appreciated what was done.
 Then followed a series of questions setting the stage for
the use of the letters that are the heart of this appeal. Dr.
Klonoski acknowledged that he was seeking damages for injury to the
marital relationship with his wife and damages for his wife's loss
of enjoyment of life. In answer to a question, Dr. Klonoski agreed
that the quality of the marital relationship would be an important
factor in the enjoyment of life. He also agreed that a good
marriage would improve the quality of life. Dr. Klonoski
testified, as he had on direct examination, that by the time he and
his wife and their two children moved to Lebanon, the marriage was
getting along much better; the primary ongoing issue was the time
he spent away from the house and family.
 In answer to a question, Dr. Klonoski testified that he
knew that his wife corresponded with her father and sister, Marta,
in Poland. Dr. Klonoski was then asked: "[I]f I were to show you
a letter, you'd certainly be able to recognize your wife's
handwriting; is that right?" The answer was "Yes, I would." After
Dr. Klonoski testified that his wife's sister lived in Krakow,
defense counsel began to show the witness a document marked for
identification. At this point, plaintiff's counsel requested a
bench conference. The request was granted.
 We feel it necessary to quote at length the bench
conference.
 MS. LUKEY: I don't have a clue what this
 is, but it's never been produced in discovery,
 and there is absolutely no question that we
 requested anything that they intend to use in
 this case. I have no idea where it came from
 or what it might be. And I assume it's in
 Polish, so I can't read it, but really this is
 unfair.

 THE COURT: What is it?

 MR. BASSETT: It's impeachment. This is
 a letter written by Mrs. Klonoski to her
 sister Marta in Poland. And this letter
 happens to have been written in late April of
 1993 and early May of 1993, and it contains in
 it a description of a number of things, most
 prominently the marital relationship and the
 significant problems that Mrs. Klonoski
 believed existed at that time, and I don't
 believe we actually just got that letter
 last night.

 MS. LUKEY: Your Honor, we had, as you
 recall, a court-ordered disclosure from them
 pertaining to anything to do with alleged
 marital discord. This was not disclosed to
 us. I don't know where it came from. I don't
 know what he's doing, but it obviously doesn't
 give me the opportunity to speak, for example,
 to his sister her sister, if that's the
 recipient. I really think this is litigation
 by ambush and totally inappropriate. This is
 a situation with an actual court order.

 MR. BASSETT: Your Honor, it's legitimate
 cross-examination. We just got that last
 night based on the testimony that we had heard
 in this case, and it's legitimate cross-
 examination. We are not required to disclose
 what we are going to use on cross-examination. 
 We specifically brought it up with the Court,
 and you said for impeachment and credibility,
 we did not have to disclose it, and we didn't
 have it until last night. But in any event,
 we want to use it for that purpose, and I
 think Attorney Lukey is entitled to go into
 those issues on reexamination.

 MS. LUKEY: Your Honor, he may not have
 to disclose it on a trial exhibit list, but in
 discovery he certainly has to disclose it if
 he has knowledge of it, and we actually had to
 get a court order to get their evidence on
 marital discord. That was the reason we asked
 for it.

 THE COURT: But he didn't have it.

 MR. BASSETT: Didn't have it until last
 night.

 MS. LUKEY: He should have had it, and
 what is it that they're contending justifies
 ambushing us with it at this moment in time.

 ....

 MR. BASSETT: We, frankly, haven't had
 the entire thing translated yet because it was
 received this one was received this morning
 actually. All we have had is a skeletal
 translation of it, your Honor, but I think at
 this point it's an admission by a party
 opponent. It's her letter, and that's how it
 would come into evidence.

 THE COURT: What does it say?

 MR. BASSETT: Well, it says quite a few
 things. He can translate it for us.

 THE COURT: I can't determine the
 relevance of "quite a few things." That's not
 relevant.

 MR. BASSETT: I'll read you my
 understanding of it, but it's this is the
 last letter from Jola. This is a paraphrasing
 of it right now, your Honor. We would ask him
 to read it because he can read Polish and he
 can translate it.

 She goes on to the subject of his of
 the pregnancy: I'm afraid of what's going to
 happen. He cares only about his career. I
 was surprised by his announcement that he was
 leaving for California and for a business
 trip.

 There are problems with her spending
 habits. He doesn't like it. I bought a baby
 stroller, and he screamed at the top of his
 lungs. I think we should get a divorce.

 She mentions that Richard is working so
 hard to become a cardiologist. She doesn't
 say her situation will improve directly, but
 intimation is she has a stake I don't
 understand what all that is. I don't,
 frankly, know what everything is in there, but
 just the fact that she says she thinks we
 should get a divorce is enough, your Honor. 
 And he can translate it.

 And its an admission. . . . This is a
 party-opponent admission. And just as we're
 entitled to make the arguments that outweigh
 it, so, too, Attorney Lukey can.

 There are three more four more of
 those. That's the first of the ones that I
 intend to offer in evidence.

 MS LUKEY: I would like to know how long
 they've known of the existence of these
 letters regardless of when they may have
 received this one.

 MR. BASSETT: I'll make a
 representation of that.

 THE COURT: How long have you known?

 MR. BASSETT: We've known about them,
 it's no more than two days. We received the
 first of them 

 THE COURT: No, no.

 MS. LUKEY: How did you know they were
 there?

 MR. BASSETT: We found Marta this week. 
 We found her three days ago. We looked for
 her father.

 MS. LUKEY: He's dead.

 MR. BASSETT: And he's dead; that's
 right. He died last winter. That's who we
 were trying to find. Instead we found Marta
 this week, and I can certainly get somebody to
 prepare an affidavit to say that she was not
 spoken to until two days ago, and in fact we
 didn't get the first transcript of these
 letters until yesterday afternoon. They were
 faxed from Poland last night. The meeting
 with Marta took place last night in Poland. 
 They were faxed to us, and I spent most of the
 night up with these letters, and translators
 spent most of the night with the letters, too. 
 We have the other letters translated. This
 one we just received within two hours. So we
 haven't had it fully translated.

 MS. LUKEY: I have a serious issue with
 this, your Honor. It's a little bit like
 springing Dawn Rafferty on us right after
 Christmas when she turns out to be Linda
 Bowers' niece, and they've known about her
 right along. There's nothing that I heard to
 suggest this is not something they could have
 determined earlier if they intended to use it. 
 This is truly an ambush. They knew about her
 sister. That's not new. I don't know what it
 is they think is new about this. But the fact
 that they choose to wait until three and a
 half weeks into a trial and then spring it on
 us as purported impeachment I find extremely
 troubling and inconsistent with the rules.

 I also have a very strong suspicion that
 the reason that they made a point with you in
 our pretrial conference some months ago of
 saying we don't have to show any impeachment,
 right, is because they knew exactly what they
 intended to do.

 I don't know what Jola wrote, and it's
 clear that Dr. Klonoski doesn't know what Jola
 wrote. I find it very upsetting and extremely
 inconsistent with the open disclosure rules of
 current litigation that this would occur. 
 This is the kind of thing that occurred 25
 years ago and was the whole reason the Rules
 of Civil Procedure were adopted. I mean I've
 built a whole case obviously, and they're
 suddenly coming in and trying to spring
 something on me about what the wife supposedly
 felt. She's dead. I can't ask her.

 But I do not feel this is appropriate. I
 have heard nothing from Mr. Bassett that
 suggests why he couldn't have come up with
 this earlier if it was something they intended
 to use. You don't keep investigating the case
 when the trial is in process.

 MR. BASSETT: Yes, you do.

 THE COURT: A lot of people do.

 MS. LUKEY: But it's inappropriate.

 MR. BASSETT: Based on the type of
 testimony we got in this case 

 MS. LUKEY: What in this case has
 justified this that you didn't know before?

 MR. BASSETT: We couldn't find them, and
 we found them now, your Honor.

 MS. LUKEY: All you had to do was ask for
 the address.

 ....

 MS. LUKEY: Your Honor, my problem is the
 method that they've done this. 

 THE COURT: Your problem is you don't
 accept that they just knew about it. I do
 accept that they did just find out as he's
 represented to me.

 MS. LUKEY: It isn't just whether they
 just knew about it. You're right. I do not
 believe that they just found out about it. 
 You're absolutely correct.

 But quite apart from that is the fact
 that what one is supposed to do is to do one's
 discovery and so forth for trial by the
 discovery disclosure date in order to ensure
 under the Rules of Civil Procedure, the
 information you come up with is shared if
 appropriately requested by the other party. 
 In this case it was not only requested, we had
 to get a court order. We got the court order
 regarding all evidence they had on the subject
 of alleged marital discord.

 MR. BASSETT: That was to identify the
 witnesses.

 THE COURT: Take the next step. Then you
 have all the evidence they had on marital
 discord.
 
 MS. LUKEY: And, frankly, that evidence
 doesn't trouble me. Then they come up with
 this.

 THE COURT: That's a different test.

 MS. LUKEY: I understand, your Honor. My
 point is if it were in fact the case that it
 was okay to send your investigator out while
 the trial was in progress, what everyone would
 do in order to avoid the necessity of
 disclosing materials that are particularly
 good for ambushing the other side is not do
 their investigation until the time of trial.

 THE COURT: Well, I hear you, but I don't
 agree with you. You took the initiative to
 put on the evidence of a good marriage, stable
 marriage. Everything's hunky-dory and
 wonderful.

 MS. LUKEY: As far as he knew.

 THE COURT: Well, as far as he knew. But
 to the extent that's relevant, I've already 
 my view, I don't think it's particularly
 relevant one way or the other. But both of
 you think it is, and once you do that, they
 have a right to then challenge whether that
 was the case. If they just got this and
 they're going to use it for impeachment, I
 think they have a right to do it.

 ....

 THE COURT: All right. I'll allow their
 use, Mr. Bassett. They'll be admissible under
 Rule 801(d)(2).

 MS. LUKEY: Your Honor, there's one other
 issue that I think 

 THE COURT: Not yet.

 MS. LUKEY: There is one other issue that
 I think I'm a little troubled about here
 that I would raise to you. This doesn't give
 me the opportunity to find out from the sister
 whether there's more to the story, more
 letters, another side, an explanation,
 whatever. I mean I cannot imagine, short of
 paying out large sums of money, what would
 cause a sister to turn over these letters,
 which has me a bit troubled, and I would like
 to know if there is more. I can't do that in
 the middle of trial. I'm about to close in 
 you know, ten minutes after he finishes his
 cross.

 So I do remind the Court again, he placed
 me in an impossible position in that regard
 because I don't know whether there's more out
 there, another side to the story or some
 explanation. Nor do I know whether money has
 changed hands. I don't know anything. I
 cannot imagine why a sister would turn these
 over to be used against her sister's estate.

 THE COURT: I'm not sure that's relevant. 
 The only question is are they legitimate
 documents.

 MS. LUKEY: But my ability to examine
 Marta is essentially nonexistent because of
 the fact that 

 THE COURT: Well, I'm not sure Marta
 makes a difference.

 MS. LUKEY: Well she might make a
 difference if it turns out that there are
 other letters, ones that came after, ones that
 came before, explanatory letters, phone
 conversations, none of which I can possibly
 know. I don't know if this is complete. I
 don't know if 

 THE COURT: Are you asking for a
 continuance?

 MS. LUKEY: No, I'm not asking for a
 continuance. I'm asking to have these
 documents excluded, your Honor, on the basis
 that it's litigation by ambush.

 THE COURT: Yeah. That objection has
 been overruled. All right.

 After Dr. Klonoski identified the letters as being in his
wife's handwriting, the court held an extended hearing on their
admissibility. After considering the arguments of counsel it
issued rulings accompanied by comments:
 I think these letters pose a substantial risk
 of unfair prejudice that would outweigh their
 probative value. I think their probative
 value, to the extent they have any probative
 value, lies on the fact of whether or not
 there was marital discord, whether a divorce
 was impending, whether she was happy or not in
 the marriage, why she was unhappy, and the
 degree of her unhappiness, as expressed in
 some of these statements, I think might be
 tangentially relevant. But to present that
 evidence in this form to the jury poses a very
 grave risk that they would start to be
 inflamed or distracted onto issues that aren't
 relevant in the case; that is, was Jolanta
 Klonoski a good or bad person? More
 importantly, was Dr. Klonoski a good or bad
 person? And factor that into their award, if
 there is an award, and they shouldn't. I
 think we all agree they shouldn't be factoring
 that into their award.

 Now, they're probably cumulative anyway,
 because you put in in fact, your case seems
 to be three experts and everybody says there's
 a bad marriage. So in a sense it's
 cumulative. So I agree it's better to have
 words in the decedent's mouth, so I'm willing
 to cut you some slack in that regard. And
 despite Attorney Lukey's, I think, well-taken
 position that these are pretty late in the
 ball game and she doesn't really have a great
 opportunity to deal with that, but I'm not
 going to give you the ruling, Attorney Lukey. 
 What I'm going to do is give you some relief
 by limiting the admissibility of these
 statements to those statements that directly
 speak about her unhappiness in the marriage,
 but not in histrionic terms and not in terms
 that pose a risk of appealing to the passion,
 prejudice of the jury, and not in terms that
 pose a risk of putting Dr. Klonoski in such a
 bad light that that might affect an award in
 this case. Like I said, I'll give you a
 chance to rebut, if you can and want to, just
 as to these statements, but I can't imagine
 you will want to.

 ....

 In my judgment well, as I think about
 it, it's probably an inconsistent view myself,
 but having read these documents, the four
 documents you presented, it's my conclusion
 that certainly to the extent that you claim
 anything is relevant in there, most of it is
 not relevant. Material statements that are
 made in these documents that might be relevant
 that seem to portray the former plaintiff, Dr.
 Klonoski, in a very poor light are not
 relevant to the issue of Mrs. Klonoski's
 future hedonic damages. To the extent they
 are relevant, or one might argue that they are
 relevant as a predictor or prognostication of
 her future happiness, I find that those
 statements, though relevant in that respect,
 would, nevertheless, be excluded. I do
 exclude them on grounds that their probative
 value is far outweighed by the risk of unfair
 prejudice in that those statements would tend
 to, in my judgment, distract the jury and
 confuse the jury and inflame the passions and
 prejudice of the jury, such that they may be
 at risk of focusing on the nature of Dr.
 Klonoski as a person in calculating a damages
 award for the estate, which we all agree would
 not be proper.

 To the extent to the limiting [sic]
 extent it gives a marriage view different than
 this than Dr. Klonoski and others portrayed,
 I think they are relevant. And I think by
 going through the letters and allowing you to
 admit those portions of the letters that give
 that contrary view, without the inflammatory
 baggage of the other statements and comments
 in the letters, I think your interests are
 fairly protected.

 So that's my ruling, I acknowledge that
 Attorney Lukey makes a very good point about
 late discovery, not that you've violated my
 order of disclosure. I find that you've not. 
 And not that you had the document in a in a
 timely fashion that you could have delivered
 them to the plaintiffs in a meaningful timely
 way. I find you didn't. But she is somewhat
 at a prejudicial point in that there are other
 letters that may present a different view
 altogether of this.

 But again, we're at the point where I
 think we're cumulative anyway on the item of
 was there discord or not discord in the
 marriage, and that's not a very major issue
 in the case, in any event. So here is what
 the potentially inconsistent part, I suppose,
 with respect to all of those other statements
 in these letters that I have not agreed to
 allow you to read to the jury or present to
 the jury. I would I also exclude those on
 grounds that, to the extent they are
 inflammatory but fall below the line of
 proposing an unfair risk of substantial
 prejudice, outweighing their probative value,
 I would exclude them on the additional
 independent grounds that Attorney Lukey does
 not have the opportunity to have those other
 nine letters translated and examined for the
 possibility that they may have equally
 praiseworthy and laudatory comments about Dr.
 Klonoski in them. So who knows. Maybe they
 would balance them off. So that's just
 another independent reason why I wouldn't
 allow the statements to be denigrating of Dr.
 Klonoski or certainly his relatives into
 evidence. All right.

 The court allowed the following excerpts in evidence. 
They were read to the jury by the defendants' translator:
 Despite the fact that I want to save this
 marriage very much, I cannot stand being
 treated as a moron, but that's how Richard
 likes to behave. I think he will never
 appreciate me as a person and will always
 expect from me obedience and approval of
 anything he proposes. This does not satisfy
 me and does not provide even a bit of
 happiness.

Excerpt from letter of May 20, 1990 (Ex. LLL, RA 4487; RA 3854).

 Now I am with him not for myself but for the
 children and I know that the day will come
 when we separate because I will not stand
 being with him to the end of my life.

Excerpt from letter of August 27, 1990 (Ex. LLL, RA 4488; RA 3855).

 And I knew that something was wrong. I did
 not have to wait long because in the evening
 he came to my bed and graciously informed me
 that on May 5, 6 and 7 he flies to California,
 San Diego, for another conference. I could
 not believe it but he said nobody was going to
 change his plans. After that last conference
 I told him I do not want him to ever fly
 without me.

Excerpts from letter of April 27 and May 1993 (Ex. LLL, RA 4489; RA 
3856).

 As you can see, I think we should get a
 divorce because we are tormenting each other
 and no good will come between us. I only pity
 this yet to be born child because it will
 never see love between its parents. Sooner or
 later both I and he will not be able to stand
 this tension and misery between us any more.

Excerpt from letter of April and May, 1993 (Ex. LLL, RA 4489; RA 
3856-3857).

 Prior to reading the letter excerpts and marking them as
exhibits, defendants put on the following witnesses whose testimony
we summarize. Joan Conrad worked in the cardiology department and
became acquainted with Dr. Klonoski. When she congratulated him on
the coming birth of another child, he said: "It wasn't my idea. 
This wasn't planned." When Conrad asked Dr. Klonoski about his
wife, he replied: "She's always complaining, lots of aches and
pains. Always complaining about headaches, and I don't pay
attention to that anymore." Conrad testified that there was no
positive feedback from Dr. Klonoski about his wife.
 The next witness was Dr. John Robb, a cardiologist, who
worked with Dr. Klonoski. Accompanied by Dr. Klonoski's parents,
he met Dr. Klonoski at the Lebanon Airport on his return from the
meeting in San Diego, and drove him to the hospital. Dr. Robb
testified that Dr. Klonoski was crying when Dr. Robb picked him up
at the airport, that he was "very distraught and upset" and
"grieving."
 Ellen Fullington was a medical secretary at the Hitchcock
Hospital. She worked for Dr. Klonoski as well as other doctors. 
She testified that Dr. Klonoski's comments about his marriage were
negative.
 Dr. Douglas H. James was director of the fellowship
program at the Hitchcock Hospital. Dr. Klonoski discussed his
marriage with him during a review of his performance. Dr. Klonoski
felt that his performance was adversely affected by stress at home.
 Dawn Rafferty worked with Mrs. Klonoski at the bank. She
testified that Mrs. Klonoski was not happy with her marriage. She
was considering a divorce, but was afraid that the children would
be taken away from her. Mrs. Klonoski complained that her husband
was only interested in money. He worked extremely long hours and
did not pay attention to her or the children. She wanted to have
another child when she became pregnant again. Dr. Klonoski was not
happy about her pregnancy. She felt that he wanted her to have an
abortion.
 The final witness for defendants was the translator who
read the letter excerpts to the jury.
 Dr. Klonoski was recalled as a rebuttal witness. He
testified as follows:
 Q. Were you aware before this weekend
 that your wife had written thoughts of divorce
 to her family?

 A. No, I was not.

 Q. Did you have any idea that she felt
 that way?

 A. No, I did not.

 Q. When you learned about her feelings,
 at least as contained at these points in time
 in these letters, what steps did you take?

 A. I was very stunned and distressed
 that her perception of things was so vastly
 different from what she represented to me and
 was distressing her at the same time and that
 she thought that she could get more answers or
 more comfort by writing to her family in
 Poland and not discussing it with me.

 When I found that out, I instructed the
 attorney in Connecticut who is handling the
 probate of her estate that I waive any right
 to the proceeds of the estate, and I
 established an irrevocable trust in the names
 of our children equally and relinquished all
 rights to them with the trustee, that is not
 myself, and that is the trustee's attorney,
 Jennifer Snyder, from Hale and Dorr in Boston.

 Q. And what is your understanding as to
 whether you now have any claim to the proceeds
 of the estate?

 A. I understand that with the execution
 of the trust, I have no claim to any of the
 proceeds in her estate.

 Q. One final question, Doctor. We heard
 testimony on the defense case that you did not
 want the pregnancy that resulted in Caroline's
 birth. Is that true?

 A. No, that's not true.

 On cross-examination there were questions about when the
irrevocable trust was established, which were answered ambiguously. 
There was also a series of questions relative to the testimony by
defendants' witnesses.
 Dr. Klonoski having withdrawn his own claims, the case
went to the jury on only one claim, that of Mrs. Klonoski's estate. 
The jury returned a defendant's verdict, and the plaintiff
appealed.
 II.
 APPLYING THE DISCOVERY RULES

 We begin our analysis with a brief review of the
pertinent rules of discovery. Rule 26(a)(3)(C) requires each
party to disclose to other parties, without awaiting a discovery
request, the following information:
 (C) an appropriate identification of each
 document or other exhibit, including summaries
 of other evidence, separately identifying
 those which the party expects to offer and
 those which the party may offer if the need
 arises.

Fed. R. Civ. P. 26(a)(3)(C).

 This rule requires that: "[u]nless otherwise directed by
the court, these disclosures shall be made at least 30 days before
trial." Id. It is obvious that defendants did not follow the
strictures of Rule 26(a)(3)(C) with respect to the letters from
Mrs. Klonoski to her sister.
 In addition to the mandatory pretrial disclosures,
parties may obtain discovery of further matter by various methods. 
See Fed. R. Civ. P. 26(a)(5). Rule 26(b)(1) defines the scope and
limits of discovery:
 (b) Discovery Scope and Limits. Unless
 otherwise limited by order of the court in
 accordance with these rules, the scope of
 discovery is as follows:

 (1) In General. Parties may obtain
 discovery regarding any matter, not
 privileged, which is relevant to the subject
 matter involved in the pending action, whether
 it relates to the claim or defense of the
 party seeking discovery or to the claim or
 defense of any other party, including the
 existence, description, nature, custody,
 condition, and location of any books,
 documents, or other tangible things and the
 identity and location of persons having
 knowledge of any discoverable matter. The
 information sought need not be admissible at
 the trial if the information sought appears
 reasonably calculated to lead to the discovery
 of admissible evidence.

Fed. R. Civ. P. 26(b)(1). Like Rule 26(a)(3)(C), Rule 26(b)(1)
provides no exception for documents found during belated
investigation that takes place after the trial has begun. On the
contrary, the plain language of this Rule 26(b)(1) contemplates
wide-ranging discovery to the fullest possible extent.
 Such a broad reading is supported by leading Supreme
Court precedent. As the Court stated in Oppenheimer Fund, Inc. v.
Sanders, 437 U.S. 340 (1978), the word "relevant" encompasses 
 any matter that bears on, or that reasonably
 could lead to other matter that could bear on,
 any issue that is or may be in the case. . . .
 [D]iscovery is not limited to issues raised by
 the pleadings, for discovery itself is
 designed to help define and clarify the
 issues. Nor is discovery limited to the
 merits of a case, for a variety of fact-
 oriented issues may arise during litigation
 that are not related to the merits.

Id. at 351 (citing Hickman v. Taylor, 329 U.S. 495, 501 (1947)).
 In Hickman, the Court characterized the "pre-trial
deposition-discovery mechanism established by Rules 26 to 37 [as]
one of the most significant innovations of the Federal Rules of
Civil Procedure." Hickman, 329 U.S. at 500. The Court went on to
discuss the purpose of the discovery rules:
 Under the prior federal practice, the pre-
 trial functions of notice-giving, issue-
 formulation and fact-revelation were performed
 primarily and inadequately by the pleadings. 
 Inquiry into the issues and the facts before
 trial was narrowly confined and was often
 cumbersome in method. The new rules, however,
 restrict the pleadings to the task of general
 notice-giving and invest the deposition-
 discovery process with a vital role in the
 preparation for trial. The various
 instruments of discovery now serve (1) as a
 device, along with the pre-trial hearing under
 Rule 16, to narrow and clarify the basic
 issues between the parties, and (2) as a
 device for ascertaining the facts, or
 information as to the existence or whereabouts
 of facts, relative to those issues. Thus
 civil trials in the federal courts no longer
 need be carried on in the dark. The way is
 now clear, consistent with recognized
 privileges, for the parties to obtain the
 fullest possible knowledge of the issues and
 facts before trial. 

Id. at 500-01 (emphasis added; footnotes omitted). The Court added
that the "deposition-discovery rules are to be accorded a broad and
liberal treatment." Id. at 507. This is because
 [m]utual knowledge of all the relevant facts
 gathered by both parties is essential to
 proper litigation. To that end, either party
 may compel the other to disgorge whatever
 facts he has in his possession. The
 deposition-discovery procedure simply advances
 the stage at which the disclosure can be
 compelled from the time of trial to the period
 preceding it, thus reducing the possibility of
 surprise. 

Id. (emphasis added).

 Similarly, in United States v. Procter & Gamble Co., 356
U.S. 677 (1958), the Court stated that "[m]odern instruments of
discovery serve a useful purpose . . . . They together with
pretrial procedures make a trial less a game of blindman's bluff
and more a fair contest with the basic issues and facts disclosed
to the fullest practicable extent. Only strong public policies
weigh against disclosure." Id. at 682 (emphasis added; citation
omitted).
 Based on the plain language of Rule 26 and the broad
scope that it has been given, it would appear that Mrs. Klonoski's
letters fit well within the rule's reach. The letters plainly
contain information "reasonably calculated to lead to the discovery
of admissible evidence." Fed. R. Civ. P. 26(b)(1). As noted,
Rule 26 provides no exception for documents found after discovery
deadlines have passed.
 To the extent the rules contemplate additional material
that a party finds after it has provided discovery to the other
side, the rules require prompt supplementation of its additional
material so the opposing party is not misled by the original
discovery responses as the opposing party prepares its case for
trial. See Fed. R. Civ. P. 26(e). Rule 26(e) provides in
pertinent part:
 (e) Supplementation of Disclosures and
 Responses. A party who has made a disclosure
 under subdivision (a) or responded to a
 request for discovery with a disclosure or
 response is under a duty to supplement or
 correct the disclosure or response to include
 information thereafter acquired if ordered by
 the court or in the following circumstances:

 (1) A party is under a duty to
 supplement at appropriate intervals its
 disclosures under subdivision (a) if the
 party learns that in some material
 respect the information disclosed is
 incomplete or incorrect and if the
 additional or corrective information has
 not otherwise been made known to the
 other parties during the discovery
 process or in writing.

 (2) A party is under a duty
 seasonably to amend a prior response to
 an interrogatory, request for production,
 or request for admission if the party
 learns that the response is in some
 material respect incomplete or incorrect
 and if the additional or corrective
 information has not otherwise been made
 known to the other parties during the
 discovery process or in writing.

Fed. R. Civ. P. 26(e). In the instant case, the defendants
provided no supplementation of their prior disclosures by adding
the letters in question to the list of evidence to be offered at
trial. 
 In 1993, the Federal Rules of Civil Procedure were
significantly amended, particularly Rules 26(e) and 37(c)(1). The
changes to Rule 26(e) substantially expanded the duty to
supplement. Under the pre-1993 version of Rule 26(e),
supplementation was required only in a few, limited circumstances. 
The current version of the rule, as quoted supra, imposes a broad
requirement on parties to update their earlier disclosures and
discovery responses. See 8 Charles Alan Wright et al., Federal
Practice and Procedure 2049.1 (2d ed. 1994 & Supp. 1998) ("Wright
& Miller"). Thus, even if the defendants could argue that the pre-
1993 rule might not have required them to disclose the letters to
the plaintiff, they have no such argument under the 1993 amendments
to the supplementation requirement. 
 IS PRECLUSION THE APPROPRIATE REMEDY?
 The 1993 amendments to the Federal Rules also added
Rule 37(c)(1) which provides:
 (c) Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.

 (1) A party that without substantial
 justification fails to disclose
 information required by Rule 26(a) or
 26(e)(1) shall not, unless such failure
 is harmless, be permitted to use as
 evidence at a trial, at a hearing, or on
 a motion any witness or information not
 so disclosed. In addition to or in lieu
 of this sanction, the court, on motion
 and after affording an opportunity to be
 heard, may impose other appropriate
 sanctions. In addition to requiring
 payment of reasonable expenses, including
 attorney's fees, caused by the failure,
 these sanctions may include any of the
 actions authorized under subparagraphs
 (A), (B), and (C) of subdivision (b)(2)
 of this rule and may include informing
 the jury of the failure to make the
 disclosure.

Fed. R. Civ. P. 37(c)(1).

 Prior to adoption of Rule 37(c)(1), no rule specifically
provided sanctions for the failure to supplement discovery. Courts
were free to apply their discretion in sanctioning Rule 26(e)
violations. The new rule is mandatory: a party that fails to make
the required disclosures "shall not, unless such failure is
harmless, be permitted to use [undisclosed] evidence at a trial." 
Id. To be sure, the rule somewhat tempers this mandate by
permitting courts to excuse failures to disclose to some degree
(i.e., to impose other sanctions "in lieu of this sanction"). Fed.
R. Civ. P. 37(c)(1). But the new rule clearly contemplates
stricter adherence to discovery requirements, and harsher sanctions
for breaches of this rule, and the required sanction in the
ordinary case is mandatory preclusion.
 Even before the 1993 amendments, in National Hockey
League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976) (per
curiam), the Supreme Court stressed the policy reasons for
enforcing the discovery rules. The most severe sanctions provided
by the rules, the Court explained, "must be available to the
district court in appropriate cases, not merely to penalize those
whose conduct may be deemed to warrant such a sanction, but to
deter those who might be tempted to such conduct in the absence of
such a deterrent." Id. at 643. While a warning alone might have
made the plaintiffs in that case comply with all future discovery
orders, "other parties to other lawsuits would feel freer than we
think Rule 37 contemplates they should feel to flout other
discovery orders of other district courts." Id. Thus, enforcement
of discovery rules and orders is necessary, the Court concluded, to
prevent abuse by future litigants. Id.
 It appears, therefore, that the letters in question were
covered by the disclosure requirements of Rule 26, including the
duty to supplement, and that defendants' failure to disclose them
prior to trial precluded defendants from using the letters at
trial. The district court did not take this position because it
found the letters to fall within an exception to the discovery
rules for material that is presented "solely for impeachment
purposes." Fed. R. Civ. P. 26(a)(3).
 DO THE LETTERS FALL WITHIN AN EXCEPTION
 TO THE DISCOVERY RULES? 

 Rule 26(a)(3) provides:
 Pretrial Disclosures. In addition to the
 disclosures required in the preceding
 paragraphs, a party shall provide to other
 parties [certain delineated] information
 regarding the evidence that it may present at
 trial other than solely for impeachment
 purposes: . . . .

Fed. R. Civ. P. 26(a)(3) (emphasis added). 
 Neither the Rule itself nor the advisory notes define
impeachment evidence. The federal cases that have decided whether
evidence falls within the impeachment exception to the discovery
rules are, for the most part, personal injury cases. They
frequently deal with two kinds of evidence: video surveillance
tapes of a plaintiff's activities subsequent to the injury giving
rise to the suit; and information that a defendant has of the
plaintiff's prior medical history. Although some district courts
have found video surveillance tapes to be "solely" impeachment
evidence, see Fed. R. Civ. P. 26(a)(3), the weight of authority
seems to be that such evidence is both impeaching and substantive
and should be disclosed. See Wegner v. Cliff Viessman, Inc., 153
F.R.D. 154, 157-59 (N.D. Iowa 1994).
 And this approach makes evidentiary sense. As the Wright
and Miller treatise put it, after reviewing the case law:
 If a party plans to testify to one version of
 the facts, and the opponent has evidence
 supporting a different version of the facts,
 the opponent's evidence will tend to impeach
 the party by contradiction, but if discovery
 of this kind of evidence is not permitted the
 discovery rules might as well be repealed. 
 Even those who have been most concerned about
 protecting impeachment material recognize that
 substantive evidence must be subject to
 discovery even though it also tends to
 contradict evidence of the discovering party. 

8 Wright & Miller, supra, 2015, at 212 (footnote omitted).
 The only circuit court that directly addresses this
subject is Chiasson v. Zapata Gulf Marine Corp., 988 F.2d 513 (5th
Cir. 1993). In holding that a video surveillance tape was not
"solely" impeachment evidence, the court defined substantive
evidence as "that which is offered to establish the truth of a
matter to be determined by the trier of fact." Id. at 517. It
then stated: "Impeachment evidence, on the other hand, is that
which is offered to 'discredit a witness . . . to reduce the
effectiveness of [her] testimony by bringing forth evidence which
explains why the jury should not put faith in [her] . . .
testimony.'" Id. (alterations in original) (quoting John P.
Frank, Pretrial Conferences and Discovery - Disclosure or
Surprise?, 1965 Ins. Law J. 661, 664 (1965)). 
 The court recognized that some evidence serves both
functions, and, because such evidence is not "solely offered for
impeachment," it is not covered by the exception to the Rule 26
discovery requirements. The court held: "Because the tape is, at
the very least, in part substantive, it should have been disclosed
prior to trial, regardless of its impeachment value." Id. at 517-
18.
 The same is true of the disputed evidence here. The
excerpts from the letters written by Mrs. Klonoski to her sister
were at least in part substantive, and therefore they did not fall
within the "solely for impeachment" exception of Fed. R. Civ. P.
26(a)(3). The letter excerpts constituted substantive evidence
because, separate and apart from whether they contradicted Dr.
Klonoski's testimony, they tended "to establish the truth of a
matter to be determined by the trier of fact." Chiasson, 988 F.2d
at 518. This is true even though, in addition to their substantive
content, the excerpts tended to contradict Dr. Klonoski's testimony
regarding the state of his marriage. We hold, therefore, that the
district court erred, as a matter of law, in finding the letter
excerpts to fall within the exception to the discovery rules for
evidence introduced "solely for impeachment purposes" of Fed. R.
Civ. P. 26(a)(3).
 Nor do we think that Fed. R. Evid. 801(d)(2) opens the
evidence door to the excerpts because they are admissions against
a party opponent, as defendants argue. The question is not the
admissibility of the excerpts under the Federal Rules of Evidence
but whether they were barred because their introduction violated
the pretrial discovery orders of the district court and federal
discovery rules. The rules of evidence do not trump the discovery
rules contained in the Federal Rules of Civil Procedure. The
purpose of the discovery rules is to provide for the "fullest
possible" pretrial disclosure of admissible evidence, to "reduc[e]
the possibility of surprise," Hickman, 329 U.S. at 500-01, and to
insure "a fair contest," Procter & Gamble, 356 U.S. at 682.
 As we have discussed, supra, absent some unusual
extenuating circumstances not present here, the appropriate
sanction when a party fails to provide certain evidence to the
opposing party as required in the discovery rules is preclusion of
that evidence from the trial.
 We have recently condemned trial by ambush tactics and
for this reason vacated a verdict returned for the defendant. 
Licciardi v. TIG Ins. Group, 140 F.3d 357 (1st Cir. 1998), centered
on the testimony of a medical expert who:
 changed course 180 degrees from his report in
 his testimony on a key topic at the heart of
 plaintiff's case. Further, he went into a new
 area of testimony. There was no prior
 disclosure of the coming volte face; indeed
 there was a misrepresentation in the
 supplemental answer to interrogatories filed
 two days after the jury was impaneled that the
 expert's testimony would be the same as in his
 initial report.

Id. at 359 (footnote omitted). We found this "volte face" to be
"highly prejudicial to plaintiff's case." Id.
 We recognize that the focus of Licciardi was on the
divergence between the pretrial disclosure of the testimony of a
party's expert witness and his trial testimony. This court's
forthright condemnation of trial by ambush, however, applies to
what happened in the case before us.
 Labadie Coal Co. v. Black, 672 F.2d 92 (D.C. Cir. 1982),
is factually closer to the situation before us. In Labadie, the
D.C. Circuit found that the district court's admission of documents
was erroneous and prejudicial because plaintiff was not given
notice of the documents until after it had rested its case on the
last day of trial. The court noted that "when the documents were
finally produced, [plaintiff] had little, if any, time effectively
to . . . cross-examine [defendant] as to their content." Id. at
94-95. In the present case, plaintiff was even more prejudiced by
the lack of discovery. He had virtually finished presenting his
entire case to the jury; Dr. Klonoski's direct testimony had been
completed. His depiction of the state of the marriage was very
different from the way he would have characterized it if his late
wife's letters had been disclosed to him prior to his testifying.
 We cannot help being impressed by the exquisite timing of
the injection of the letters into the trial. Dr. Klonoski, the
last witness in the plaintiff's case, had finished his direct
testimony. The plaintiff's case had been completed. Cross-
examination started with some innocuous questions. This was
followed by what clearly were questions setting up Dr. Klonoski for
the introduction of the letters. Whether by design or accident the
timing could not have been better for defendants.
 Policy reasons also militate against the district court's
ruling that the letters are exceptions to the discovery rule. If
letters or other documents are allowed in evidence after a trial
starts for the sole reason that they were not obtained sooner by
the party offering them, the rules of discovery and court orders
pertaining thereto would become empty phrases signifying nothing. 
Trial by ambush would be re-born. Enforcement of discovery rules
and orders is necessary to prevent abuse by future litigants. SeeNational Hockey League, 427 U.S. at 643.
 THE ADEQUACY OF DEFENDANTS' EXPLANATIONS
 Defense counsel argued successfully to the district court
that the reason the letters had not been disclosed was that counsel
had not received them until two days prior to the start of their
cross-examination and did not have an opportunity prior to their
use at trial to have them translated from Polish to English. This
explanation was accepted by the district judge. But it is beside
the point. The fact that a party had not actually obtained certain
documents before the discovery deadline does not excuse a
violation. 
 The belated appearance of the letters violated the plain
meaning and the intent of the discovery rules. It also ignored the
specific requirements of the court's pretrial discovery orders. 
The contents of Mrs. Klonoski's letters were not disclosed prior to
trial, as they should have been under the July 16, 1996 discovery
order which provided specifically: "defendants shall produce a
list of all persons known by them to possess discoverable
information related to: (1) marital discord between Dr. and Mrs.
Klonoski . . . and a general description of the nature of that
information." The final pretrial order was based on the parties'
representations that discovery had been completed and the case was
ready for trial. 
 Nor can the defendants be excused for their failure to
comply. That defense counsel did not obtain the letters until two
days before their use at trial on cross-examination does not make
them admissible. Defendants had been furnished with the address of
Mrs. Klonoski's father in Poland more than a full year before
trial. Her father and sister lived at the same address. The
defendants could, at that time, have undertaken the same
investigation that for some unexplained reason did not come to
fruition until the trial was near completion. They have offered no
legitimate explanation for why they waited as long as they did,
knowing that the federal rules and the court had required them to
disclose potential trial exhibits and all relevant responses to
discovery requests well before the trial began. This suggests
that the defendants may have been, at best, either lax or negligent
in pursuing pretrial discovery.
 Finally, defense counsel admitted that they at least knew
about the letters and the general outlines of their contents two
days earlier than they disclosed them, i.e., they knew about them
before Dr. Klonoski testified on direct. Counsel could have put
plaintiff on notice that certain new and hitherto undisclosed
evidence was on the verge of becoming available on the issue of
marital discord. If such notice had been given at that point,
prior to Dr. Klonoski's testimony on direct, then undoubtedly his
testimony would have been different and the present problem would
most likely never have arisen.
 THE DISTRICT COURT'S RULING
 After reading the district court's rulings and comments,
we have difficulty understanding the basis of its decision to allow
excerpts from the letters to be read to the jury. The first
paragraph of the court's order states: "I think these letters pose
a substantial risk of unfair prejudice that would outweigh their
probative value." Despite this pronouncement, the court admitted
excerpts from the letters into evidence. With due respect, we do
not think that the prejudice was reduced appreciably by limiting
the court's ruling to the excerpts read to the jury. In fact, by
shortening lengthy letters and allowing into evidence only the
inflammatory portions, their prejudicial impact was probably
heightened.
 We are also puzzled by the statement: "I acknowledge
that Attorney Lukey makes a very good point about late discovery,
not that you've violated my order of disclosure. I find that
you've not." The only basis for this finding was that the court
believed the letter fell within the impeachment exception
provisions of Fed. R. Civ. P. 26(a)(3). We have found, supra, that
the exception does not apply. Clearly the introduction of the
letters without prior notice to plaintiff violated the pretrial
discovery order of July 19 and the final pretrial order.
 We agree with the court's statement that Attorney Lukey
"is somewhat at a prejudicial point in that there are other letters
that may present a different view altogether of this." We believe
this greatly understated the predicament in which plaintiff's
attorney found herself. First, Attorney Lukey was correct that,
because of the defendants' failure to provide these letters during
the discovery process, plaintiff's counsel was unable to conduct
her own investigation which might uncover other letters from Mrs.
Klonoski explaining what she wrote in the letters introduced by
defendants, or which might demonstrate that Mrs. Klonoski's anger
was a passing feeling that did not reflect her overall view of the
marriage. But more critically, plaintiff had already planned and
executed his trial strategy based on the evidence available to the
parties through discovery. He had presented his entire case,
including the direct examination of his lead witness. To spring
these letters hitherto unknown by plaintiff and his attorneys 
upon the plaintiff at that stage of the litigation was a lot more
than "somewhat . . . prejudicial." Realistically, it was
devastating to his ability to succeed with the jury.
 A CONTINUANCE AS A POSSIBLE REMEDY
 The district court asked plaintiff's counsel at least
twice if she wanted a continuance. She said she did not want one
because she did not think it would do any good. It is true, as
defendants argue, that in some cases we have found that surprise
evidence could be combated by granting a continuance to the
surprised party. See Newell Puerto Rico, Ltd. v. Rubbermaid, Inc.,
20 F.3d 15, 22 (1st Cir. 1994). In Licciardi we discussed at
length the effectiveness of a continuance as an antidote to
surprise evidence. 140 F.3d at 366-67. As we stated there: 
 It is true that, where effective to counteract
 the surprise to one party wrought by the other
 party's failure to abide by Rule 26, a
 continuance or the calling of a rebuttal
 witness is preferable to terminating the trial
 and beginning anew. However, a continuance is
 not effective in every circumstance to
 counteract the unfair surprise. See Thibeault[v. Square D Co.], 960 F.2d [239,] 246 [(1st
 Cir. 1992)] ("[A] continuance is often
 ineffectual as a sanction and unfair to both
 the court and the opposing party.").

Licciardi, 140 F.3d at 366. We found no practical way for the
plaintiff to remedy the surprise; any solution would have
prejudiced the plaintiff even more. Id. at 366. We thought it
important to consider the policy behind the discovery rules. 
Directly contrary to this policy, granting a continuance, we found,
would create greater incentives for attorneys to violate
Rule 26(e). Id.; see also National Hockey League, 427 U.S. at 643
(Strict sanctions are necessary "to deter those who might be
tempted to such conduct in the absence of such a deterrent."). 
"Such conduct should not be rewarded." Licciardi, 140 F.3d at 367. 
And as we also noted in Thibeault: "If continuances were granted
as a matter of course for violations of Rule 26(e), the rule could
always be disregarded with impunity." Thibeault, 960 F.2d at 246;
see also Freund, 956 F.2d at 359.
 We think this rationale applies with equal force to the
instant case. We fail to see how a continuance could have
accomplished anything in this case. As plaintiff's counsel pointed
out orally at the hearing on the admissibility of the letters, the
only thing she could have done was to take the deposition of Dr.
Klonoski's sister-in-law to find out as much as she could about the
letters. Because of the distances involved and the language
problems, this would have necessitated a lengthy continuance. A
continuance was not a practical alternative.
 Moreover, short of a new trial, a continuance would have
accomplished nothing at all to mitigate the prejudice caused to
plaintiff's case by defendants' having waited until after Dr.
Klonoski had finished his direct testimony before disclosing the
letters to the plaintiff. As noted supra, defense counsel knew
about the letters prior to Dr. Klonoski's testimony. If counsel
had notified the plaintiff at that point, then perhaps a
continuance might have been the appropriate remedy.
 A continuance would have been an inadequate remedy in
this case also because of the policy concerns regarding incentives
for parties to comply with discovery rules. See National Hockey
League, 427 U.S. at 643 (Absent strict sanctions, "other parties to
other lawsuits would feel freer than we think Rule 37 contemplates
they should feel to flout other discovery orders of other district
courts."). As plaintiff's counsel told the district court, if we
were to condone the procedure followed by the defendants in this
case, then "what everyone would do in order to avoid the necessity
of disclosing materials that are particularly good for ambushing
the other side is not do their investigation until the time of
trial."
 IS A NEW TRIAL REQUIRED?
 Finally, the defendants argue that, even if the district
court erred by admitting the letter excerpts into evidence and
allowing the defendants to use them in cross-examining Dr.
Klonoski, a new trial is not warranted because the letter excerpts
could have had no effect on the jury's verdict of no liability. 
Their contention can be summarized as follows. In his jury
instructions, the district court judge told the jury to consider
the letter excerpts only in its determination of hedonic damages. 
Because the jury found that the defendants were not liable, it
never reached the damages issue. Therefore, the admission of the
letter excerpts were, at the most, harmless error.
 This argument has surface appeal but we reject it. We
note that the cases cited by defendants in support of their
position are not cases involving the breach of discovery orders and
the discovery rules. Defendants' precedential support consists of
cases that focus on the judge's instructions after the admission or
exclusion of evidence. See Navarro de Cosme v. Hospital Paria, 922
F.2d 926 (1st Cir. 1991).
 Where there has been, as there was here, an egregious
breach of discovery orders and the discovery rules, we think that
the controlling case is Anderson v. Cryovac, Inc., 862 F.2d 910
(1st Cir. 1988). The plaintiffs in Anderson sued for personal
injuries allegedly sustained because of toxic contamination to
water wells. The jury found that the defendants were not
responsible for the pollution. Shortly after the trial, the
plaintiffs learned that the defendants had failed to disclose a
groundwater study during pretrial discovery. Id. at 922. The
plaintiffs moved to set aside the judgment under Fed. R. Civ. P.
60(b). Id. at 923. The district court denied the motion because
the "plaintiffs had not been prevented from fully and fairly
presenting their case." Id. 
 We reviewed the district court's ruling for abuse of
discretion. We noted that under Fed. R. Civ. P. 60(b), "the court
may relieve a party . . . from a final judgment, order, or
proceeding for . . . (3) fraud . . . (4) misrepresentation, or
other misconduct of an adverse party." Fed. R. Civ. P. 60(b)
(emphasis added). We held that the "[f]ailure to disclose or
produce materials requested in discovery can constitute
'misconduct' within the purview of this subsection." Anderson at
923 (citing Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir.
1978)).
 We defined misconduct as follows:
 "Misconduct" does not demand proof of
 nefarious intent or purpose as a prerequisite
 to redress. For the term to have meaning in
 the Rule 60(b)(3) context, it must differ from
 both "fraud" and "misrepresentation." 
 Definition of this difference requires us to
 take an expansive view of "misconduct." The
 term can cover even accidental omissions--
 elsewise it would be pleonastic, because
 "fraud" and "misrepresentation" would likely
 subsume it. Cf. United States v. One Douglas
 A-26B Aircraft, 662 F.2d 1372, 1374-75 n.6
 (11th Cir. 1981) (to avoid redundancy,
 "misrepresentation" in Rule 60(b)(3) must
 encompass more than false statements made with
 intent to deceive). We think such a
 construction not overly harsh; it takes scant
 imagination to conjure up discovery responses
 which, though made in good faith, are so
 ineptly researched or lackadaisical that they
 deny the opposing party a fair trial. 
 Accidents--at least avoidable ones--should not
 be immune from the reach of the rule. Thus,
 we find ourselves in agreement with the Fifth
 Circuit that, depending upon the
 circumstances, relief on the ground of
 misconduct may be justified "whether there was
 evil, innocent or careless, purpose." Bros
 Inc. v. W. E. Grace Mfg. Co., 351 F.2d 208,
 211 (5th Cir. 1965), cert. denied, 383 U.S.
 936, 86 S. Ct. 1065, 15 L. Ed. 2d 852 (1966).

Id. at 923.

 Anderson holds that any "uncertainties attending the
application of hindsight in this area" should favor the party that
was denied discovery because "parties ought not to benefit from
their own mis-, mal-, or nonfeasance." 862 F.2d at 924.
 We concluded:
 To summarize, in motions for a new trial
 under the misconduct prong of Rule 60(b)(3),
 the movant must show the opponent's misconduct
 by clear and convincing evidence. Next, the
 moving party must show that the misconduct
 substantially interfered with its ability
 fully and fairly to prepare for, and proceed
 at, trial. This burden may be shouldered
 either by establishing the material's likely
 worth as trial evidence or by elucidating its
 value as a tool for obtaining meaningful
 discovery. The burden can also be met by
 presumption or inference, if the movant can
 successfully demonstrate that the misconduct
 was knowing or deliberate. Once a presumption
 of substantial interference arises, it can
 alone carry the day, unless defeated by a
 clear and convincing demonstration that the
 consequences of the misconduct were nugacious. 
 Alternatively, if unaided by a presumption--
 that is, if the movant is unable to prove that
 the misconduct was knowing or deliberate--it
 may still prevail as long as it proves by a
 preponderance of the evidence that the
 nondisclosure worked some substantial
 interference with the full and fair
 preparation or presentation of the case.

Id. at 926 (emphasis added).
 We think this case falls well within the parameters of
Anderson. As already noted, there was, intentional or otherwise,
an egregious breach of the discovery orders and the discovery rules
which resulted in "substantial interference with the full and fair
preparation" of plaintiff's case. We cannot know with certainty
what impact the letter excerpts had on the jury, but to dismiss
what happened as harmless error would render the discovery rules
and orders issued thereunder useless. Moreover, where, as in this
case, undisclosed evidence is introduced at a key point in the
trial, it would be unrealistic to say that it had no effect on the
jury's determination as to liability. If the jury decided that Dr.
Klonoski was a tyrant as a husband and a liar, his chances of
obtaining a favorable and fair verdict were destroyed. We find
that the district court erred as a matter of law in allowing the
letter excerpts into evidence and, as in Anderson, abused its
discretion in not granting plaintiff's motion for a new trial. 
 In Perez-Perez v. Popular Leasing Rental, Inc., 993 F.2d
281 (1st Cir. 1993), we applied the Anderson misconduct test to a
Fed. R. Civ. P. 59 motion for a new trial. Here, the plaintiff
sought damages for emotional distress sustained because of her
sister's death. She alleged that one defendant drove into the
sister while she was walking on the side of the road. During the
trial, the plaintiff used a previously-undisclosed expert witness. 
Id. at 286. Prior to trial, the plaintiff never suggested that the
defendant's eyesight was at issue. Id. During the defendant's
direct examination, his lawyer noted he wore glasses and asked one
question about them. Id. The plaintiff's lawyer focused on the
defendant's eyesight during cross-examination. Id. Following this
testimony, the plaintiff's lawyer sought to introduce an eye doctor
as a "rebuttal witness." Id. Despite contacting the doctor four
months prior to trial, the plaintiff's lawyer never listed the
doctor as a potential witness. Id.
 In its decision to allow the doctor to testify, the
district court stated that "there was 'no excuse as to why
[counsel] kept [Dr. Kleis' testimony] under [his] sleeve until this
moment;' and . . . the proffered testimony changed the theory of
the case." Id. at 287 (alterations in original). Noting, however,
that this misconduct was not the plaintiff's fault, but rather her
counsel's, the district court admitted the testimony as an "act of
justice." Id.
 We found that this decision was an abuse of discretion. 
In response to the district court's "act of justice" reason for
admitting the evidence, we stated that the court
 is aware of the difficulty of excluding highly
 relevant and perhaps dispositive testimony
 which apparent substantive justice requires
 should be considered by the jury. Apparent
 substantive justice may be illusory, however,
 if the purportedly dispositive evidence is not
 subject to a fair testing in an even-handed
 process.

Id. at 287 n.4. Applying the analysis of Fed. R. Civ. P. 59(a)
used in Conway v. Chemical Leaman Tank Lines, Inc., 687 F.2d 108,
111-12 (5th Cir. 1982), the Perez-Perez panel found that the
undisclosed eye doctor "exactly comports with" the Fifth Circuit's
definition of "unfair surprise" and prejudiced the defendants'
case. Id. at 287. Because the doctor's testimony introduced a
"novel theory of liability," defense counsel could not "design an
intelligent litigation strategy to address the charge of visual
impairment and . . . effectively cross-examine [him]." Id. In
addition, we found that the criteria for "misconduct" set forth in
Anderson "apply equally to this motion under Rule 59." Id. at 288. 
 The same reasoning applies to the case before us. We
conclude that the district court's error in admitting Mrs.
Klonoski's letters was prejudicial, not harmless. 
 CONCLUSION
 We find that the district court abused its discretion in
allowing the excerpts from the letters in evidence. There was a
clear violation of the court's pretrial discovery orders and the
requirements of the discovery rules. It follows that the court
also abused its discretion in denying plaintiff's motion for a new
trial.
 In fairness to the district court, we must explain that
our findings of abuse of discretion were not based on any arbitrary
refusal by the court to require compliance with its pretrial orders
and the discovery rules. Rather, the court's findings stemmed from
its legally incorrect ruling that the letters fell within the
impeachment exception of Fed. R. Civ. P. 26(a)(3). This does not
mean that there was no abuse of discretion. As the Supreme Court
has stated, "[a] district court by definition abuses its discretion
when it makes an error of law." Koon v. United States, 518 U.S.
81, 94-102 (1996); see United States v. Marroquin, 136 F.3d 220,
223 (1st Cir. 1998); Golas v. HomeView, Inc., 106 F.3d 1, 3 (1st
Cir. 1997).
 We vacate the judgment below and remand for a new trial. 
Costs on appeal awarded to appellant.